FILED
United States Court of Appeals
Tenth Circuit

February 23, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KIMBERLY BERRY,

      Plaintiff – Appellant,

v.

MISSION GROUP KANSAS, INC., d/b/a
Wright Business School,

      Defendant - Appellee.

No. 10-3289
(D.C. No. 2:08-CV-02439-JPO)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

Kimberly Berry filed a Title IX claim against her employer, Mission Group,

Kansas, which does business as Wright Business School (WBS). She alleged WBS

terminated her employment in retaliation for reporting incidents of sexual harassment

against female students by a male instructor. A five-day trial resulted in a jury verdict for

WBS. Berry moved for a new trial based on the trial court's exclusion of evidence

regarding the county attorney's consumer fraud investigation of WBS which was ongoing

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

at the time she was fired.  She also claimed the court erred in excluding evidence that WBS had failed to timely implement a sexual harassment policy.  The court denied the motion for a new trial.  We affirm.

## I.  BACKGROUND

During the relevant time period, Mission Group, Kansas, operated three separate technical training schools, including WBS.  WBS hired Kimberly Berry on February 2, 2006, as the externship coordinator for the surgical technician program.  Her duties included marketing the program to area hospitals and doctor's offices to persuade them to extend externships to students and job opportunities after graduation.

The events at issue occurred during May and June 2007.  During this time, three separate circumstances developed:  (1) Berry notified WBS executives that instructor Ray Gonzalez was sexually harassing female students; (2) two WBS employees were fired; and (3) the Johnson County, Kansas, district attorney (DA) was conducting an investigation of WBS based on consumer fraud complaints.

A.      Complaints of Sexual Harassment

There were three instructors in the surgery technician program, Sara Roe, Gary Able and Gonzalez.  On May 10, 2007, Berry received a telephone call from Roe, who told Berry she had seen Gonzalez making sexual advances towards a married female student.  Roe said Gonzalez became belligerent when she confronted him.  In response to this information, on May 11, 2007, Berry sent an e-mail to David Parmenter, Corporate

Director of Education, who was one of Berry's two immediate supervisors.[1] The e-mail stated:

> It has come to my attention, that there has been some very disturbing and inappropriate behavior going on [in] the ST classroom. So far I have had a personal discussion with a student and have verified this information with another instructor. I am told there are other students with similar complaints as well. They are to talk with me later today. I feel it is important to address this immediately and am not sure how to proceed. I believe this will be something David Toledo and/or John Mucci [President of Mission Group] may need to be involved with as well. Please either e-mail me or call me to discuss this today if possible.

(Vol. V at 1039.)

Parmenter immediately forwarded the e-mail to his supervisor, David Toledo, Vice-President of Operations. Toledo contacted Berry and arranged to speak with her.[2] After discussing what Berry had learned, Toledo and Berry interviewed the student. The student verified the information and stated she was very uncomfortable attending Gonzalez's class. Toledo asked the student what he could do while the matter was being investigated. Accommodating the student's request, Toledo allowed her to skip her weekly three-hour externship review class with Gonzalez until the matter was resolved. Toledo also asked her to put her complaint in writing.

---

[1] Lisa Frederichs, WBS Campus Director, was Berry's other immediate supervisor. In April 2007, Frederichs resigned from her position as Campus Director; Justin Berkowitz replaced her sometime in May 2007.

[2] According to Berry, her meeting with Toledo occurred in the parking lot and Toledo told her she need not take the matter further, *i.e.*, to James Miller, Mission Group's Chairman, or John Mucci, President of Mission Group. Toledo denied this occurred.

On May 16, 2007, on Berry's instruction, Roe sent an e-mail to Toledo reporting that she had heard Gonzalez tell a "disgusting" joke to the students the previous day. (Vol. V at 1030.) Berry followed up with an e-mail to Parmenter (copied to Mucci) on May 18, 2007. Berry stated she was checking to make sure Roe had notified Parmenter of Gonzalez's latest transgression. She also informed Parmenter of previous inappropriate behavior by Gonzalez with another student.

On May 21, 2007, pursuant to Toledo's earlier request, the student e-mailed Toledo, Mucci and Parmenter with her statement regarding Gonzalez's behavior. On the same day, Berry followed-up with an e-mail to verify these individuals had received the student's report.

On May 22, 2007, yet another student wrote a complaint against Gonzalez and gave her statement to Berry. Berry telephoned Mucci, who then came to her office to retrieve the student's statement. In addition to these conversations, Berry testified to having met with Parmenter several times to discuss why Gonzalez was still teaching.

Around May 28, 2007, Mucci and Dean of Students, Malisa Wacker, interviewed several students and instructors. All confirmed the complaints against Gonzalez. Mucci terminated Gonzalez's employment on May 31, 2007.

However, on the same day, an e-mail from Roe's account was sent to Mission Group's Chairman, James Miller. The e-mail said:

> I know that I could get fired for this but I feel that I must say something about the sexual harassment that is taking place in the surg tech department by [Gonzalez]. I was told by David Toledo and John Mucci to not contact you with this matter but nothing has been done and he is still sexually harassing students. A student has filed a complaint and now is being told

- 4 -

not to come to school because of the sexual comments made to her. Management has dropped the ball on this and I have no other choice but to contact you. I would prefer to remain anonymous since I still work with [Gonzalez] outside WBS. [Y]ou are opening yourselves up to a potential lawsuit.

(Vol. V at 1032.) Miller responded in a return e-mail on June 1, with copies to Mucci, Toledo and another board member. The e-mail informed Roe that Mucci was in charge of the investigation and the matter would be resolved that day.

When Toledo mentioned this e-mail to Roe a few days later, she denied writing it. Roe suggested perhaps Berry had sent it because they shared a computer. At some point, Roe and Berry had a meeting with Toledo about the e-mail. According to Berry, Toledo called her and Roe into his office and was very angry because someone had gone "outside the chain of command" to involve Miller. (Vol. II at 442.) However, Toledo testified they discussed the security of the e-mail system, not the substance or the recipient of the e-mail.[3]

B.      The Termination of LeBeouf and Adkins

While the Gonzalez investigation was occurring, another problem began to unfold. On May 10, 2007 (the same day Berry received the first complaint regarding Gonzalez), WBS dismissed instructor Larry LeBeouf and Dean of Students Cathy Adkins. At trial, according to Mucci's testimony, LeBeouf became very angry when he was fired and threatened to "take [WBS] down." (Vol. IV at 768.)

_____

[3] Toledo's testimony was supported by notes Berry wrote in November 2007, where she stated her recollection of the meeting was that Berry and Roe went to Toledo and Berkowitz and they discussed security concerns about the e-mail system. Berry's notes did not mention anyone being angry. [Vol. V at 1048]

Shortly thereafter, Berry received e-mails from Adkins. According to Berry, the first few messages from Adkins merely asked her to not believe what people were probably saying about Adkins and LeBeouf. Eventually, however, Adkins asked Berry to gather confidential school information for LeBeouf. Berry testified that she responded in an e-mail angrily refusing to share confidential student information. She said LeBeouf telephoned her in late May to explain why he wanted the information and they spoke for an hour and a half. He said the information would assist the DA in his investigation of WBS regarding allegations of consumer fraud. Berry also telephoned LeBeouf the day WBS terminated her employment to tell him she was angry and believed he had caused her to lose her job.

C.      The District Attorney's Investigation

In December 2006, the Johnson County DA's office received complaints against WBS alleging consumer fraud, primarily complaining about the adequacy of the surgical technician program. The DA began an investigation which continued until after Berry was discharged.[4] Berry received a call from the DA's office on May 18, 2007. She was informed she had a choice to either give a voluntary statement or she would be subpoenaed. The DA's investigator interviewed Berry on June 18, 2007, four days after she was fired from WBS. In that interview, she disclosed her conversations with LeBeouf.

---

[4] No charges were filed against WBS as a result of the investigation. [Vol. I at 93-94]

D.    Berry's Termination

At trial, Dean Malisa Wacker testified that in late May or early June, Berry told her LeBeouf and Adkins had been sending her e-mails seeking school information. Berry said she had retained approximately 160 files "on the school" to take with her when she left WBS. (Vol. III at 695.) Wacker said Berry asked her several times to help collect more information. Wacker told Berry she was not interested in seeing the e-mails from LeBeouf or Adkins or in providing information. At first, Wacker did not report this conversation because she did not want to get involved. But after several staff meetings in which she was told the school was concerned that confidential information was being given to LeBeouf and WBS wanted it stopped, Wacker told Berkowitz, the new campus director, what Berry had said about keeping school files and her communication with LeBeouf. At Berkowitz's request, Wacker sent two e-mails describing what Berry had told her. Berkowitz forwarded the e-mails to Toledo on June 13, who in turn, reported the matter to Mucci.

After receiving these e-mails, Mucci received another call from Toledo later in the day. Toledo reported he was checking on a WBS employee, Brandon Wilson, who had been hired in May 2007 as an attendance dean. Wilson had not reported to work for some time. Because Wilson had appeared to be an excellent employee, Toledo attempted to contact him and urge him to return to work. When Wilson did not answer Toledo's phone calls, Toledo went to his home and left his card. Wilson then telephoned Toledo on June 13, 2007, and told Toledo that he did not want to return to WBS as "he was sick and tired of getting dragged in the middle of this thing." (Vol. IV at 766.) Wilson said

LeBeouf had been calling him and leaving messages to the point Wilson's wife told him to return LeBeouf's call to make it stop. According to Toledo, when Wilson returned the call, LeBeouf "basically" said "I'm recruiting past and present employees that want to help me take down [WBS]." (*Id*. at 838-39.) When Wilson asked LeBeouf how he got Wilson's number, LeBeouf said Berry gave it to him. Toledo reported his conversation with Wilson to Mucci.

Mucci testified that after Wacker's e-mails, Toledo's telephone call reporting Wilson's statements were the "trigger" that convinced Mucci to immediately terminate Berry's employment. At Mucci's direction, Berkowitz terminated Berry's employment on June 14, 2007. Berkowitz told her she was fired for "communicating about school business with an outside source." (Vol. I at 225.) He told Berry if she wanted a more complete explanation to contact Mucci. Berry e-mailed Mucci asking why she was fired. Five days later, Mucci responded:

> We have reason to believe that you have disparaged WBS to our clients, students and staff. We also have information that you have disclosed confidential client and employee information to unauthorized individuals.

(Vol. V at 1034.)

## II. PROCEDURAL HISTORY

Berry filed a claim against WBS on September 16, 2008, alleging retaliation under Title IX and violations of public policy. She voluntarily dismissed her public policy claims and filed an amended complaint alleging only that WBS terminated her employment in retaliation for bringing sexual harassment complaints against Gonzalez.

Prior to trial, both parties moved to exclude evidence at trial. At issue here are

- 8 -

WBS's motion to exclude reference to the DA's investigation and Berry's motion to admit evidence that WBS had not enacted a sexual harassment policy prior to a deadline agreed to in a Resolution Agreement with the United States Department of Education.[5] The court[6] granted WBS's motion to exclude the contents of the investigation and its results. However, it determined a ruling on whether it would exclude "*all* evidence of the existence of the investigation . . ." would be premature. (Vol. I at 111.) The court denied Berry's motion to admit the Resolution Agreement because the existence of a sexual harassment policy was irrelevant to retaliation and the Agreement's relevance was outweighed by the danger of unfair prejudice.

At trial, during Berry's cross-examination, WBS's counsel asked about the two conversations Berry had with LeBeouf – the one and a half hour conversation in late May and the conversation on the day WBS terminated her employment. Counsel asked: "What necessitated [LeBeouf] calling you while you were on vacation and talking to him for an hour and a half?" Berry responded:

> Because [Adkins] had sent me approximately three emails, I believe. I had not responded to any of them until after, I believe, it was like the third one.
>
> And they were very innocuous, she was telling me that she didn't want me to believe what she assumed was being said about their dismissal.
>
> And on the third email, she had actually asked me for information. And I

---

[5] In 2005, the United States Department of Education received a student complaint against WBS regarding sexual harassment by an instructor. WBS entered into a Resolution Agreement in which it agreed to develop and implement a policy prohibiting sexual harassment and a revised grievance procedure by October 4, 2006. The policy was not enacted until September 2007.

[6] The case was tried before a magistrate judge by consent of the parties.

did respond in a very hostile way to her that I was in no way going to give the information, and I was very upset that I had been asked.

[LeBeouf] contacted me to basically explain why they had asked me [for information].

(Vol. III at 530-31.)  There was no contemporaneous objection to this question.

WBS's counsel also asked about the call Berry made to LeBeouf on the day she was fired.  When Berry could not recall whether she had called that day, the defense played a segment of the videotaped interview Berry had given the DA's investigator establishing she had called LeBeouf the day she was dismissed.  WBS's counsel then asked:

Q. Now, when you placed this call to Mr. LeBeouf on the day you were terminated, you informed him that you had been fired; true?

A. That's true.

Q. And you said you were angry about it; true?

A. Yes.

Q. Why did you feel it necessary to disclose all that to Mr. LeBeouf?

(Vol. III at 538-39.)  When Berry's counsel objected, the question was withdrawn.

The next line of cross-examination addressed the e-mails Adkins sent to Berry. Berry conceded Adkins placed an admonition in the subject line:  "do not open this at work."  (*Id.* at 550.)  When counsel asked "why . . . Ms. Adkins [would] presume to be able to tell you . . . what to open and what not to open at work," Berry responded she had "no idea."  (*Id.* at 550-51.)

At that point, Berry's counsel approached the bench and made an offer of proof. He explained the DA's investigator had called Berry on May 18th and told her that she

could make a voluntary statement or be subpoenaed.  Counsel wanted to introduce evidence of the investigation because, contrary to WBS's suggestion she was helping LeBeouf take the school down, the e-mails and the conversations with LeBeouf were for the purpose of cooperating with the DA.  After further argument, the court determined WBS had not opened the door to this line of questioning and, to address Berry's concern that the setting of the DA's interview could cause the jury to speculate that Berry was charged with some sort of wrongdoing, the court instructed the jury that Berry was never the subject of any criminal investigation.

After the jury returned with a verdict for WBS, Berry moved for a new trial based on the court's exclusion of testimony regarding the DA's investigation.  The court denied the motion, concluding the probative value of the evidence was minimal while potentially "leading the jury to return a verdict for retaliation that had nothing to do with the Title IX context in which this case was tried."  (Vol. V at 1101.)

### III.  DISCUSSION

Berry argues the court erred in excluding evidence of (1) the DA's investigation and (2) WBS's failure to timely comply with the Resolution Agreement and these errors warrant a new trial.  We disagree.

To prove her retaliation claim, Berry was required to establish she was terminated, at least in part, because of her complaints against Gonzalez.[7]  *See Twigg v. Hawker*

---

[7] "Title IX . . . prohibits gender discrimination against students enrolled in federally supported educational programs and has been construed to provide an implied cause of action to an aggrieved individual."  *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).  "Retaliation against a person

- 11 -

*Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). If she cannot directly establish that retaliation played a motivating part in the employment decision, she may "rely on the three-part framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), to prove retaliation indirectly." *Id.*

> Under the *McDonnell Douglas*/indirect approach, the plaintiff must first make out a prima facie case of retaliation by showing (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. If the plaintiff establishes a prima facie case, the employer must then offer a legitimate, nonretaliatory reason for its decision. Finally, once the employer has satisfied this burden of production, the plaintiff must show that the employer's reason is merely a pretext for retaliation.

*Id.* (citations and quotations omitted). "A plaintiff demonstrates pretext by showing that the employer's proffered explanation is unworthy of credence." *Jaramillo v. Colo. Judicial Dep't.*, 437 F.3d 1303, 1309 (10th Cir. 2005) (quotations omitted). "Once the employer's justification has been eliminated, [retaliation] may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.*

Evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 403 of the Federal Rules of Evidence provides:

> The court may exclude relevant evidence if its probative value is

---

because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims. *Gossett*, 245 F.3d at 1176.

> substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Whether the relevance of evidence is outweighed by unfair prejudice is a decision committed to the sound discretion of the trial court, and it will not be disturbed on appeal absent a showing of a clear abuse of discretion. *Texas E. Transmission Corp. v. Marine Office-Appleton & Cox Corp.,* 579 F.2d 561, 566 (10th Cir. 1978). We defer to the "district court's familiarity with the details of the case and its greater experience in evidentiary matters, particularly "with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice." *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) (quotations and citation omitted). We reverse "only if we have a firm and definite belief that the trial court made a clear error in judgment." *Macsenti v. Becker,* 237 F.3d 1223, 1236 (10th Cir. 2001). We find no abuse of discretion in the district court's reasoned evidentiary rulings.

A.    Evidence of the District Attorney's Investigation

Berry claims the existence of the investigation was highly relevant to the issues at trial for two reasons: (1) it was necessary to counter WBS's claims that it reasonably believed Berry was acting with LeBeouf to take the school down, and (2) it was the basis of a prior inconsistent statement necessary to impeach Mucci and demonstrate his reasons for her termination were pretext.

The court concluded the existence of the investigation was only marginally relevant, if relevant at all, to establish WBS dismissed Berry because of the complaints against Gonzalez.

- 13 -

Evidence that there was a DA investigation ongoing or that Berry was speaking to LeBeouf about that investigation does not establish the requisite causal connection [between the internal investigation and her discharge]. Even if the jury was informed that Berry was only speaking to LeBeouf because of the DA's investigation and even if the jurors were convinced that it was wrong to fire her for cooperating with the DA's investigation, that still would not have been sufficient grounds to enter a verdict for Berry if the jury was not convinced that she was fired for complaining about sexual harassment. The same is true for Berry's claim that evidence of the DA's investigation would have discredited WBS's claims that Berry was wrongfully handling school records or that she was the source of student complaints. Such evidence might indicate that WBS's decision to fire Berry was not wise, fair, or correct, but it neither proves nor disproves that WBS fired Berry because she engaged in protected conduct under Title IX.

(Vol. V at 1098-99.) We agree with the court's reasoning.

WBS presented evidence that student information must be kept confidential and the unauthorized release of such information could subject it to closure. Mucci testified he discharged Berry because he believed she was providing confidential information to LeBeouf in his attempt to take the school down and she had given him Wilson's telephone number. But, according to Berry, the only reason she was speaking with LeBeouf was to cooperate with the DA's investigation. Excluding evidence of the investigation prevented her from correcting the false impression created by WBS that she was assisting LeBeouf in some sort of illegal activity. She maintains the evidence was "inextricably intertwined" with the other evidence, so that its admission was essential to understand her actions. (Appellant's Br. at 33.)

The problem with Berry's argument is that *why* she was communicating with LeBeouf is irrelevant to her retaliation claim. As the district court observed, Berry makes no connection between her complaints about Gonzalez and her criticism of WBS's

- 14 -

response to those complaints and her involvement in a consumer protection investigation. Even if the jury knew Berry's motives were pure and WBS fired her for assisting the DA, this information sheds no light on whether WBS retaliated against her for lodging complaints of sexual harassment.

Berry claims evidence of the DA's investigation was also necessary to prove her theory of pretext and to undermine WBS's defense theory. Primarily, she argues she should have been allowed to impeach Mucci with his prior inconsistent statement. At his deposition, Mucci said he was worried about Berry's contacts with LeBeouf, particularly in light of the DA's investigation and Berry's comment that she had been collecting school files. Berry claims this testimony shows Mucci was not worried about the unauthorized release of confidential information as he testified at trial. Rather, Mucci was concerned about LeBeouf and Berry's cooperation with the DA. Had she been allowed to impeach him with this testimony, Berry contends the jury could have inferred Mucci was casting about for plausible alternatives when, in fact, Berry was terminated for two reasons – her involvement in the DA's investigation *and* her complaints of sexual harassment.

"A plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo*, 427 F.3d at 1308.

Berry asserts: "Obviously, if she was talking with LeBeouf because of the district

attorney's investigation, this makes it highly implausible that she was plotting with him to damage the school out of malice and revenge. This, in turn, would have allowed the jury to reject *all* of Mucci's emotional testimony about the school being shut down if a governmental agency found out that student records had gone missing." (Appellant's Br. at 35.) We disagree. Even if Berry had been allowed to show that WBS's "danger to the school" defense was based not on federal policies but on leaks to the DA's investigation, this does not lead to a reasonable inference her employment was terminated because of complaints regarding sexual harassment.

"To raise an inference of pretext in the face of the employer's legitimate, nondiscriminatory explanation, the plaintiff must undermine the employer's credibility to the point that a reasonable jury could not find in its favor." *Jaramillo*, 427 F.3d at 1310. "This exception is based on the common-sense notion that if a person is shown to be a liar in an outrageous manner, the inference that the person is *non-credible,* and should not be believed as to other issues, is a reasonable one." *Id.* (quotations omitted). While Mucci did not say he fired Berry in connection to the DA's investigation, Mucci's isolated deposition statement simply is not outrageous enough to undermine the legitimate rationale for his decision. Indeed, his statement about the DA's investigation is preceded by his concern regarding Wacker's e-mails, especially Berry's reported statement "she was collecting files on the school that she was going to take with her when she left." (Vol. 1 at 98.) To the extent that his testimony at trial was inconsistent by not mentioning the DA's investigation, it was certainly not so outrageous as to destroy his credibility.

As we have stated:

> Something less than total failure of the employer's defense is sufficient to create a genuine issue of fact when (1) the reasons are so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid; (2) the pretextual character of one explanation is so fishy and suspicious that a jury could find that the employer (or its decisionmaker) lacks all credibility; (3) the employer offers a plethora of reasons, and the plaintiff raises substantial doubt about a number of them; (4) the plaintiff discredits each of the employer's objective explanations, leaving only subjective reasons to justify its decision; or (5) the employer has changed its explanation under circumstances that suggest dishonesty or bad faith.

*Jaramillo*, 427 F.3d at 1310 (quotations and citations omitted).  None of these exceptions apply to Berry's case.  The failure to mention the DA's investigation as a cause of concern is not intertwined with the Gonzalez complaints and does not undermine the reasons Mucci gave for his decision – his belief that Berry was planning on an unauthorized sharing of confidential information.  And WBS did not offer a "plethora" of reasons for Berry's termination.

Berry's arguments merely underscore the court's concerns regarding potential prejudice and jury confusion should the DA's investigation evidence be admitted.  As the court stated:

> Evidence that WBS was being investigated for consumer fraud would have potentially been very prejudicial to WBS by putting evidence before the jury that WBS was at least suspected of wrongdoing for conduct having nothing to do with the issues in this case.  While in some contexts this evidence could be considered prejudicial but not unfairly so, here, given the shallow probative value of the DA's investigation, it is unlikely that this evidence would have been anything but unfairly prejudicial to WBS in this case.
>
> Further, there is also significant risk that evidence of the DA's investigation could have confused or misled the jury.  Berry's own motion for a new trial

- 17 -

states that her participation in the DA's investigation "was part of the reason WBS fired her." But the issue in this case was whether Berry was terminated for reporting sexual harassment and participating in the school's *internal investigation*, not whether she was fired for assisting the DA's office with their investigation. Allowing Berry to put on evidence of the DA's investigation would have unnecessarily muddied the waters and could have potentially led the jury to return a verdict for retaliation that had nothing to do with the Title IX context in which this case was tried.

(Vol. V at 1100-01.)

Berry argues the evidence was not unfairly prejudicial because WBS "opened the door" through its suggestion that Berry was communicating with LeBeouf and Adkins in violation of federal privacy laws. We have no doubt that, had Berry been able to explain her extended conversation with LeBeouf and portions of the e-mails exchanged between Berry, LeBeouf and Adkins in the context of the DA's consumer protection investigation, the jury may have believed she was unfairly fired. But it does nothing to inform the jury on the actual issues at trial – whether WBS's dismissal was motivated by her complaints about sexual harassment. To determine whether "the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision* not the plaintiff's subjective evaluation of the situation." *Luster v. Vilsack*,--- F.3d ---, No. 11-1013, 2011 WL 6000545, *4 (10th Cir. Dec. 1, 2011) (quotation and citation omitted). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id*. The district court did not abuse its discretion in excluding the admission of this evidence.

B.      Sexual Harassment Policy

Berry also alleges the court erred in excluding the fact that WBS had not instituted a sexual harassment policy as agreed under the Resolution Agreement.  She argues this evidence was relevant to show why she complained to several different persons when Gonzalez was not removed from the classroom, why she believed WBS was violating Title IX, and to rebut WBS's claim that it was concerned about following federal regulations.  Again, the court did not abuse its discretion in determining the relevance of this evidence was substantially outweighed by the potential for unfair prejudice.  The events in 2005 may have shown WBS's historical indifference to addressing sexual harassment issues but there was no dispute that Berry had direct access to the managers responsible for investigating her complaints and her complaints did lead to an investigation.  Thus, the existence of an official sexual harassment policy was of limited relevance to her retaliation claim.  The court did not abuse its discretion in concluding the potential unfair prejudice should the evidence be admitted substantially outweighed its probative value.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

- 19 -