**Susan G. BENNETT, Plaintiff–Appellant,**

v.

**WINDSTREAM COMMUNICATIONS, INC., a Delaware corporation, Defendant–Appellee.**

**No. 14–5091.**

United States Court of Appeals, Tenth Circuit.

July 9, 2015.

Courtney D. Powell (and Shannon F. Davies, with her on the brief), Lester, Loving & Davies, P.C., Edmond, OK, for Plaintiff–Appellant.

Michael R. Pacewicz (and Christina F. Cupp, with him on the brief), Crowe & Dunlevy, Tulsa, OK, for Defendant–Appellee.

Before KELLY, EBEL, and LUCERO, Circuit Judges.

KELLY, Circuit Judge.

Plaintiff–Appellant Susan Bennett appeals from the district court's grant of summary judgment in favor of her employer, Defendant–Appellee Windstream Communications, Inc. (Windstream). *Bennett v. Windstream Commc'ns, Inc.,* 30 F.Supp.3d 1243, 1260 (N.D.Okla.2014). Ms. Bennett brought several claims alleging gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), age discrimination under the Age Discrimination in Employment Act (ADEA), violation of the Oklahoma Antidiscrimination Act (OADA), and constructive discharge in violation of Oklahoma public policy and federal law. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

*Background*

In 2011, Windstream acquired the company that had employed Ms. Bennett for

twelve years, Paetec Communications, Inc. (Paetec). At the time of the acquisition, Ms. Bennett was a Fiber Optic Tech III (FOT–III), responsible for locating fiber optic cable, repairing, splicing, and testing it, and performing routine weekly and monthly maintenance at various sites. II App. 360, 367. Her service area generally covered Stroud, Kiefer, Tulsa, Muskogee, and Vian in Oklahoma, and Ozark and Van Buren in Arkansas. *Id.* at 362.

After the acquisition, Ms. Bennett's pay and benefits remained the same. I App. 212. Windstream employed written policies against workplace discrimination, and its "People Practices" manual stated it "will not tolerate any type of harassment or discrimination against any employee by coworkers, management, customers or vendors." *Id.* at 78.

A few months after Windstream assumed Paetec's operations, Todd Moore became Ms. Bennett's supervisor. Mr. Moore also supervised other former Paetec technicians located in Oklahoma and Missouri. *Id.* at 202–03. In April 2012, Mr. Moore instituted a policy requiring all technicians, including Ms. Bennett, to check in to an assigned manned office each morning at 8 a.m. unless they had tasks to perform at other worksites. *Id.* at 203, 224–25. Ms. Bennett was assigned to check in at the Tulsa office, which was the closest manned office to her home in Gore, Oklahoma. *Id.* at 231–32. Given the distance between Gore and Tulsa, Ms. Bennett was required to commute a total of almost four hours each day. Prior to the acquisition, Ms. Bennett had worked out of a small office in a regeneration site in Vian, Oklahoma, substantially closer to her home in Gore. II App. 364–65.

Ginine Stover, a Human Resources specialist, testified that the check-in policy, though not written, was standard Windstream practice. I App. 213. Windstream provided several reasons for the policy,

including the volume of work and number of customers located in the Tulsa and northeastern Oklahoma area. *Id.* at 203. Also, the check-in requirement enabled the integration of Paetec into Windstream through employee cross-training. *Id.* at 203–04. Windstream generally required technicians to store company vehicles on secured company premises; technicians drove privately-owned vehicles to and from the office each day. *See id.* at 234–35. The check-in policy was consistent with this procedure.

Ms. Bennett understood that she was required to report to the Tulsa office each morning at 8 a.m. *Id.* at 226–27. Yet, she often arrived at the Tulsa office more than two hours late. *Id.* at 204. On a number of occasions, she did not report to the Tulsa office at all or left several hours early to drive home, rather than working until 5 p.m. as required. *Id.* She informed Windstream she was unable to make the long commute due to personal responsibilities. II App. 290. But, as Ms. Bennett conceded during oral argument, she never directly requested an accommodation from the check-in requirement. Regardless, although Windstream apparently does make certain workplace accommodations for its employees, no such accommodations were available for this situation. *Id.* at 327–30.

Donald Rogers, Area Manager of Operations for Windstream and Mr. Moore's direct supervisor, stated that Ms. Bennett's time and attendance issues made it impossible to implement a complete cross-training program for her. I App. 204. Often, the Windstream technician with whom she was scheduled to train had left the office to begin field work by the time she arrived in Tulsa mid-morning. "Had Ms. Bennett complied with the requirement to report to the office at 8:00 a.m., she would have received the same cross-training opportunities as all other technicians." *Id.* Ms.

Bennett testified she was not aware of any employees who were offered training opportunities not offered to her. Doc. 36–3 at 117.

Ms. Bennett received a "final coaching" session—the first disciplinary step under Windstream's progressive discipline policy—regarding her tardiness and absences from Mr. Moore and Ms. Stover on May 22, 2012. I App. 217, 247. On the same day, during a phone call, Ms. Bennett reported she was experiencing chest and shoulder pain due to work-related stress. She stated she had an appointment to visit a doctor the following day. II App. 411–13. Mr. Rogers directed Mr. Moore to complete a workers' compensation claim regarding her potential injury pursuant to Windstream policy. I App. 249; II App. 411–12.

Windstream's short term disability carrier, MetLife, requires an employee to initiate a short term disability claim if the employee is out for more than three consecutive days or several intermittent days. Ms. Bennett began a leave of absence on May 28, 2012. I App. 254–55. Her last day of work was May 25, 2012, and MetLife issued short term disability benefits to her through June 27, 2012. *Id.* Windstream then paid out Ms. Bennett's remaining vacation days and other paid leave through July 27, 2012. *Id.* at 266; II App. 394–95.

On June 15, 2012, Windstream retrieved a company vehicle and tools that had been assigned to Ms. Bennett. I App. 260. Ms. Stover and Mr. Moore testified that, since Ms. Bennett was not using the vehicle and tools during her leave, Windstream needed them to allow other technicians to perform their duties. *Id.* at 220, 236.

On July 26, 2012, Windstream sent Ms. Bennett a letter giving her three options: (1) return to work, (2) provide medical documentation supporting continued short term disability leave, or (3) resign. She

was required to elect one of these options by 5 p.m. on August 3, 2012, or Windstream would "treat [her] absence as job abandonment and terminate [her] employment effective that day." *Id.* at 264. Ms. Stover testified that this "three options letter" is routinely sent to Windstream employees who have taken a leave of absence and who have not received an extension of short-term disability benefits from MetLife. *Id.* at 221–22. Ms. Bennett understood she would be deemed to have abandoned her job if she did not elect one of the three listed options. Yet, instead of electing an option, on the deadline she sent an email to Mr. Moore and Mr. Rogers, copying Ms. Stover, stating that "[t]he discriminating conditions you have placed on me have made it impossible to work for Windstream.... I have no choice but [to] petition severance pay to support myself and health needs and get out from under the constant state of distress." *Id.* at 274.

On August 8, 2012, Ms. Stover sent Ms. Bennett a letter informing her that her employment with Windstream had been "separated," based on her failure to return from the leave of absence. *Id.* at 266.

### Discussion

We review a grant of summary judgment de novo, applying the same legal standard as the district court. *Adamson v. Multi Cmty. Diversified Servs., Inc.,* 514 F.3d 1136, 1145 (10th Cir.2008). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a dispute over a material fact is "genuine" only if "the evidence is such that a

**1266**

reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the burden of showing that no genuine dispute of material fact exists. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998). In considering a motion for summary judgment, we draw all reasonable inferences in favor of the nonmoving party. *See Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1214 (10th Cir.1998).

## I. Title VII and ADEA Gender and Age Discrimination Claims

 First, Ms. Bennett asserts claims of gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623. Under both Title VII and the ADEA, a plaintiff bears the ultimate burden of proving her employer intentionally discriminated against her. *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir.2015); *Adamson*, 514 F.3d at 1145. A plaintiff can prove intentional discrimination through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination. *Riser*, 776 F.3d at 1199.

 Where, as here, a plaintiff seeks to use circumstantial evidence to show her employer's discriminatory intent, we employ the three-step burden-shifting framework set forth in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Adamson*, 514 F.3d at 1145. Under the *McDonnell Douglas* framework, a plaintiff first must establish a prima facie case of gender or age discrimination. A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination.[1] *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir.2007). While the elements of a prima facie case "are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." *Adamson*, 514 F.3d at 1146.

 Once the plaintiff has established her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 1145. Then, the burden of production shifts again to the plaintiff to show that the defendant's explanation was merely pretextual. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097,

---

1. The district court analyzed Ms. Bennett's prima facie case of discrimination using a similar four-part articulation of the test. *Bennett*, 30 F.Supp.3d at 1253 (stating a plaintiff must show she is a member of a protected class, she suffered an adverse employment action, she is qualified for the position at issue, and she was treated less favorably than others not in the protected class). In *McDonnell Douglas*, the Supreme Court noted that the elements required for a plaintiff's prima facie case may vary depending on the context of the claim and the nature of the alleged conduct. 411 U.S. at 802 n. 13, 93 S.Ct. 1817; *accord Young v. United Parcel Serv., Inc.*, ––– U.S. ––––, 135 S.Ct. 1338, 1353–54, 191 L.Ed.2d 279 (2015). The Tenth Circuit has utilized a number of similar versions of the test, expressing a preference for more concise formulations. *See, e.g., Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n. 4 (10th Cir.2013) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir.2005).

147 L.Ed.2d 105 (2000). The plaintiff may establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir.2010).

### A. *Ms. Bennett Has Not Established a Prima Facie Case*

Ms. Bennett maintains that, for purposes of Title VII and ADEA liability, the only adverse employment action about which she complains is her termination. The other employment actions she describes in detail serve to bolster her assertion of discriminatory animus. Aplt. Br. 15. We agree with the district court that Ms. Bennett has not established a prima facie case of either gender or age discrimination.

Both Title VII and the ADEA expressly prohibit discriminatory discharge as an adverse employment action. 42 U.S.C. § 2000e–2(a)(1); 29 U.S.C. § 623(a)(1). As noted, Ms. Bennett was given three options upon the conclusion of her short-term disability leave, consistent with Windstream's routine practice: return to work, provide the documentation necessary for additional disability leave, or resign. Windstream informed her that failure to elect an option would be treated as job abandonment. App. 264. The parties contest whether these facts can support a claim of involuntary termination. We need not resolve this question here because, in any event, Ms. Bennett has not produced evidence showing that the alleged discharge occurred under circumstances giving rise to an inference of discrimination.

Ms. Bennett asserts a number of Windstream's actions suggest discriminatory animus, including requiring Ms. Bennett to check in each morning at the Tulsa office, instituting disciplinary proceedings against her when she failed to do so, submitting a workers' compensation claim form when Ms. Bennett reported chest and shoulder pain, filing a short term disability claim on her behalf, retrieving its vehicle and tools during her leave of absence, and denying her cross-training opportunities. Although her burden of production at the prima facie stage is "not onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, Ms. Bennett points to no evidence in the record, either direct or circumstantial, supporting a claim of animus.

For example, Ms. Bennett asserts that Windstream's motive in implementing the daily check-in requirement was to enable the transfer of her duties to preferred younger, male employees. She states that Mr. Moore's policy required "only Bennett—the only female FOT–III in the region—to 'check in' each morning in Tulsa." Aplt. Br. 19. To the contrary, the record shows the policy requiring check-in at a manned office applied uniformly to a number of employees supervised by Mr. Moore. Ms. Bennett may have had the most burdensome daily commute as a result of the new company policy, but she cites no authority for the position that employers must account for their employees' commutes when designing uniform attendance policies.

Ms. Bennett also asserts that "Windstream refused to consider [her] eligibility for any of its flexible work schedule policies." *Id.* But she conceded she did not request any such accommodation, and the record shows Windstream did not have any accommodation policy that would have assisted Ms. Bennett in accomplishing her desired working arrangement.

Additionally, Ms. Bennett argues that Windstream refused to offer her equivalent training opportunities. "Instead of being trained like the male employees," upon check-in she was "shuffled to a cubicle to fill out her expense reports." Aplt. Br. 19. Yet, the record does not show Windstream denied Ms. Bennett equal opportunities; instead, it shows Ms. Bennett was unable to participate in the cross-training program Windstream openly offered to her because of her attendance issues. Further, she has not identified evidence showing that other technicians—of any age or gender—received training opportunities she was not offered.

For these reasons, Ms. Bennett has failed to establish a prima facie case of gender or age discrimination.

B. *Ms. Bennett Has Not Shown Pretext*

Even if Ms. Bennett could establish a prima facie case of gender or age discrimination under the *McDonnell Douglas* framework, Windstream has articulated several legitimate non-discriminatory reasons for the employment actions about which Ms. Bennett complains. Most importantly, since Ms. Bennett asserts her purported termination is the sole adverse employment action forming the basis of her complaint, her separation from the company occurred only after she declined to return to work or submit the documentation required for an extended leave. Additionally, Windstream demonstrated that its check-in policy was a standard practice intended to facilitate efficient work assignments and enable integrative cross-training. Windstream stated Ms. Bennett's training opportunities were limited only because her own time and attendance problems created logistical difficulties. Had she arrived for daily check-in at the required time, she would have received the same training opportunities as all other technicians. Windstream reported Ms.

Bennett's alleged injury to its workers' compensation carrier and the Oklahoma Workers' Compensation Court because it was required to do so by Oklahoma law. And Windstream's short-term disability policy applies equally to all employees and serves to ensure that injured employees do not return to work prematurely.

Ms. Bennett has failed to produce evidence that these—or any other—explanations proffered by Windstream for its actions were merely pretextual. Although we must construe all facts favorably to Ms. Bennett, *Curtis,* 147 F.3d at 1214, in evaluating alleged pretext we must consider the facts as they appeared to the decision-makers, *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1119 (10th Cir.2007). We will not second-guess an employer's business judgment or replace its opinion of best practices with either an employee's opinion or our own. *Garrison v. Gambro, Inc.,* 428 F.3d 933, 938 (10th Cir.2005). Thus, we do not ask whether an employer's decisions were wise or fair; we ask only "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs,* 497 F.3d at 1118–19.

The Supreme Court has advised that, in determining whether evidence of pretext can permit an inference of discrimination and avoid summary judgment, relevant factors include "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097. As discussed above, Ms. Bennett has failed to establish a prima facie case, and she has presented no evidence that the reasons underlying Windstream's policies and decisions are false. She highlights that pretext can be shown by evidence of

differential treatment of similarly situated employees or procedural irregularities, Aplt. Br. 22, but she points to evidence of neither.

In short, Ms. Bennett has demonstrated that Windstream's new policies led to a difficult employment situation for her, in stark contrast to the favorable conditions she had enjoyed under different supervision for the previous twelve years. Yet, she has failed to produce any evidence, either direct or circumstantial, that these policies reflect discrimination on the basis of gender or age.

## II. *Title VII Retaliation Claim*

 Ms. Bennett next asserts a claim of retaliation in violation of Title VII. Title VII prohibits retaliation against an employee who has "opposed" any practice made unlawful by Title VII, or who has "participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Title VII retaliation claims require an employee to demonstrate that, but for her protected activity, she would not have faced the alleged adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). In accordance with our analysis above, we conclude that Ms. Bennett cannot meet this burden.

## III. *OADA Claim*

Ms. Bennett also asserts a claim of gender and age discrimination under the Oklahoma Antidiscrimination . Act (OADA). Okla. Stat. Ann. tit. 25, § 1302. The OADA makes it unlawful for an employer to "fail or refuse to hire, to discharge, or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, privileges or responsibilities of employment" because of sex or age. *Id.* § 1302(A)(1). The statute allows a defending party to "allege any defense that is available under Title VII of the Civil Rights Act of 1964[or] the Age Discrimination in Employment Act." *Id.* § 1350(F). Along with her Title VII and ADEA discrimination claims, Ms. Bennett's OADA claim fails for the reasons outlined above.

## IV. *Constructive Discharge Claim*

 Finally, Ms. Bennett asserts a separate claim of constructive discharge in violation of Title VII and the public policy of Oklahoma. We agree with the district court that, to the extent her claim is based on a violation of Oklahoma public policy, such claims are no longer viable. *Id.* § 1101(A) (stating the OADA provides exclusive remedies under Oklahoma law for individuals alleging sex or age discrimination in employment). Under federal law, "[c]onstructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir.1998) (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986)). To establish constructive discharge, a plaintiff must show that "she had no other choice but to quit." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325 (10th Cir.2004). We apply an objective standard: "The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant." *Sanchez*, 164 F.3d at 534.

Ms. Bennett's constructive discharge claim fails. For the reasons outlined in the preceding sections, Ms. Bennett has shown neither that Windstream engaged in any illegal discriminatory conduct, nor that such conduct was so extreme that she had no realistic option but to resign.

AFFIRMED.