**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TAWNY HIATT,

     Plaintiff - Appellant,

v.

COLORADO SEMINARY, a Colorado
nonprofit corporation; ALAN KENT;
JACARANDA PALMATEER,

     Defendants - Appellees.

No. 16-1159

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:15-CV-00192-RBJ)**
_____

Charlotte N. Sweeney (Ariel B. DeFazio, with her on the briefs), Sweeney & Bechtold, LLC, Denver, Colorado, appearing for Appellant.

Jim Goh (Heidi K. Wilbur, with him on the brief), Constangy, Brooks, Smith & Prophete, LLP, Denver, Colorado, appearing for Appellees.
_____

Before **HARTZ**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

    Dr. Tawny Hiatt appeals from the district court's grant of summary judgment to

her former employer, Colorado Seminary, and her former supervisors, Dr. Alan Kent and

Dr. Jacaranda Palmateer, on her Title VII and Title IX discrimination and retaliation claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*

The following facts are presented in the light most favorable to Dr. Hiatt, the non-moving party on summary judgment. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011).[1]

Colorado Seminary owns and operates the University of Denver ("DU"), including DU's Health and Counseling Center ("HCC"), which provides wellness services such as counseling to DU's student body. In November 2011, DU hired Dr. Hiatt to be a Staff Psychologist and the Training Director at the HCC.

The following recounts Dr. Hiatt's employment at DU from November 2011 until her resignation in June 2014.[2]

### 1. **Dr. Hiatt's Position as Training Director and Her Supervisory Duties**

As Training Director, Dr. Hiatt was responsible for supervising psychology students seeking their professional licensure. Supervisees included both pre-doctoral

---

[1] The parties have made our presentation of the facts challenging as they frequently cite briefs to support factual assertions rather than evidence in the record. We have endeavored to rely on record evidence, such as deposition testimony or meeting notes, rather than the parties' district court briefing.

[2] Dr. Hiatt alleges her resignation amounted to a constructive discharge. We discuss this assertion below.

interns and post-doctoral fellows.[3] Dr. Hiatt was, in turn, supervised by Dr. Kent, the Executive Director of the HCC, and Dr. Palmateer, the HHC's Director of Counseling Services. Apart from her work at DU, Dr. Hiatt also maintained a private practice, which DU permitted so long as her job at DU remained her first priority.

From November 2011 to August 2012, Dr. Hiatt supervised four interns, including Dr. Emily Fogle, from DU's Graduate School of Professional Psychology ("GSPP") Internship Consortium. After the academic term, the interns provided positive reviews of Dr. Hiatt's supervision.

When Dr. Fogle returned to the HCC as a post-doctoral fellow, she requested that Dr. Hiatt supervise her during the 2012-2013 academic year. They started their supervisory relationship in the fall of 2012. Soon thereafter, Dr. Fogle suggested to Dr. Abby Coven, her former GSPP classmate, that she hire Dr. Hiatt to supervise her work in a private practice unaffiliated with DU. Dr. Coven did so.

In December 2012, Dr. Hiatt and Dr. Coven developed romantic feelings for one another. On January 3, 2013, Dr. Hiatt ended her supervision of Dr. Coven's work in private practice. They continued their personal relationship.

On January 1, 2013—before anyone at DU knew about Dr. Hiatt's relationship with Dr. Coven—Dr. Hiatt was promoted to Assistant Director of Counseling Services/Training Director. In this role, Dr. Hiatt continued to supervise students,

---

[3] We refer to the supervisees as "doctors," even if they were not doctors at the time of these events, where there is record support for their since becoming doctors.

including Dr. Fogle as a post-doctoral fellow and a group of HCC interns—Dave Shanley, Kim Mathewson, Alexis Wilbert, and Christine DeVore.

## 2. **Revelation of the Relationship**

On January 28, 2013, Dr. Coven told Dr. Fogle about her romantic relationship with Dr. Hiatt. Dr. Fogle told Dr. Palmateer about the relationship and that she had seen text messages showing it had started before Dr. Hiatt ended her supervision of Dr. Coven. Dr. Hiatt disputes that any such messages occurred.

Dr. Fogle also told Dr. Hiatt's four intern supervisees about the relationship. Dr. Fogle then expressed her concerns about the relationship to Dr. Hiatt. Dr. Hiatt offered to stop supervising Dr. Fogle, but Dr. Fogle declined.

Dr. Kent and Dr. Palmateer decided to hold an "open meeting" on February 19, 2013, with Dr. Hiatt and her supervisees so the supervisees could air any concerns. During the meeting, Dr. Hiatt apologized for disappointing the supervisees and explained how her supervision of Dr. Coven was different from that of an intern.

## 3. **Post-Meeting Events**

After the meeting, four relevant events happened.

First, Dr. Fogle, Dr. Mathewson, and Dr. Shanley elected to end supervision with Dr. Hiatt. Dr. Wilbert and Dr. DeVore, along with Dr. Hiatt's four graduate student supervisees, continued their supervision with Dr. Hiatt.

Second, Dr. Kent met with Dr. Fogle after the meeting. Dr. Fogle reported that supervision with Dr. Hiatt was like therapy. Dr. Fogle explained that Dr. Hiatt "had [her]

sobbing in her office," and that Dr. Hiatt "made [her] feel vulnerable." *Id.*[4] According to

Dr. Hiatt's own deposition testimony, supervisees called the experience of crying or

breaking down during supervision with her as "being Tawny-ed." *Id.* at 166.

Third, Dr. Kent sought ethics guidance from DU administrators, psychologists

unaffiliated with DU, and the American Psychological Association ("APA") about Dr.

Hiatt's relationship relative to her work. Based on those conversations, Dr. Kent

determined Dr. Hiatt was in an "ethical grey area." *Id.* at 66 ¶ 13. The asserted grey area

arose from two rules in the APA's Code of Conduct: one prohibiting a psychologist from

having sexual relationships with supervisees,[5] and another prohibiting a psychologist

from having a personal relationship with someone closely connected to someone with

whom the psychologist has a professional relationship.[6]

---

[4] The record shows another supervisee had expressed similar concerns about Dr. Hiatt's supervisory style before the February 13, 2013 meeting. *See* App. at 178 (Dr. Kent's deposition relaying that Dr. Shanley had felt, "shortly after beginning therapy supervision with her," that Dr. Hiatt's supervisory style was "uncomfortable and intrusive").

[5] APA Rule 7.07 states "[p]sychologists do not engage in sexual relationships with students or supervisees who are in their department, agency, or training center or over whom psychologists have or are likely to have evaluative authority." App. at 189.

[6] APA Rule 3.05 states a psychologist should refrain from entering a "multiple relationship"—defined as having a relationship with someone closely associated with a person with whom the psychologist has a professional relationship—if the multiple relationship "could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists." App. at 188.

Fourth, Dr. Kent talked frequently with Dr. Hiatt about these matters. According to Dr. Kent, Dr. Hiatt failed to acknowledge that the way she handled her relationship at work had detrimental effects on her supervisees. Further, rather than take personal responsibility for the supervisees' reactions, Dr. Hiatt blamed the supervisees' pathologies as causing their strong reactions, including their decisions to stop supervision with her. Dr. Kent also said Dr. Hiatt showed no awareness of how her supervisory style affected them. Apart from ethical concerns, Dr. Kent determined that Dr. Hiatt's conduct showed "a serious lack of judgment given her position as a role model for the trainees." *Id.* at 66 ¶ 13.

4. **The Demotion Decision**

On February 22, 2013, Dr. Hiatt met with Dr. Kent and Dr. Palmateer. Dr. Kent presented Dr. Hiatt with three options: (1) resign; (2) be demoted and undergo six months of outside counseling about her supervisory style; or (3) remain in her position and allow Human Resources ("HR") to handle the matter.

Dr. Kent and Dr. Palmateer explained they were presenting these options because: (1) a "majority" of trainees refused to be supervised by Dr. Hiatt and she had lost "credibility and authority in their view"; (2) her conduct posed a "grey ethical issue," and a Training Director needed to display "exemplary ethics, boundaries, and professionalism"; and (3) her "approach to therapy and supervision requires a strict adherence to boundaries which weren't demonstrated in this situation" and her response to the students' reactions showed a "lack of personal responsibility." *Id.* at 450.

- 6 -

On February 27, 2013, before Dr. Hiatt chose an option, her attorney sent DU a letter claiming DU's request for Dr. Hiatt to leave her position as Training Director amounted to sex discrimination.

On March 4, 2013, Dr. Hiatt accepted the second option—demotion. In her new position as Staff Psychologist/Outreach Coordinator, Dr. Hiatt was paid $58,000—a $2,000 reduction in pay from her previous position.

5. **Period of Demotion**

As a condition of her demotion, Dr. Hiatt met with Dr. Shirley Asher, an outside consultant. Based on her sessions with Dr. Hiatt, Dr. Asher opined that Dr. Hiatt "likely could return" to a supervisory role, but also noted that she was not likely to change her supervisory style. *Id.* at 526.

During this time, Dr. Palmateer gave Dr. Hiatt a performance review that criticized her for taking paid time off in a manner that made her unavailable to her clients. Dr. Hiatt nonetheless received a raise of $500, which Dr. Hiatt calls "negligible." Aplt. Br. at 16.

In August 2013, Dr. Kent and Dr. Palmateer reassessed whether Dr. Hiatt should return to supervision. Based on Dr. Asher's input, some supervisees' negative feedback in their exit interviews about Dr. Hiatt's supervision style, and Dr. Kent's and Dr. Palmateer's own observations, they determined that Dr. Hiatt should not return to supervision at that time. They shared with Dr. Hiatt the supervisees' "perception that she intentionally breaks them down to the point of tears, is intrusive in their personal issues, blurs the boundaries of supervision and therapy, and then holds herself up as the rescuer."

App. at 109. They also shared their own concerns that she had behaved unprofessionally in staff interviews, had unclear boundaries when supervising, and continued to focus on the supervisees' psychopathologies as explaining why they were upset about the way she handled the relationship at work, rather than acknowledging her contribution to their concerns.

In September 2013, Dr. Hiatt filed an internal grievance with DU's HR department requesting, among other things, that DU restore Dr. Hiatt to her position as Training Director. In the same month, she filed an internal Equal Employment Opportunity ("EEO") complaint with DU alleging sex discrimination, as well as retaliation.

In a September 26, 2013 response to her internal EEO complaint, Dr. Kent and Dr. Palmateer further detailed their reasons for demoting Dr. Hiatt and not returning her to a supervisory position. They explained that, because Dr. Asher stated Dr. Hiatt would not likely change her supervisory style, they did not reinstate Dr. Hiatt's supervisory duties.

Their response also reported that "several" supervisees in their exit interviews described "troubling interactions" with Dr. Hiatt—such as denigrating other HCC staff members, "sham[ing]" the supervisees and then trying to "rescue" them, and insisting that a supervisee give her a hug during a supervisory session. App. at 526-27. Those examples led Dr. Kent and Dr. Palmateer to believe Dr. Hiatt had "very poor boundaries which create[d] a hostile training environment." *Id.* at 527. The response also highlighted that Dr. Hiatt continued to blame the supervisees and their associated "pathologies" for the upheaval at the HCC, and that she failed to demonstrate awareness

of how she contributed to the situation or how her supervisory style negatively affected the supervisees.

> Dr. Kent and Dr. Palmateer explained in summary:

> While Dr. Hiatt's romantic relationship with her supervisee was not the reason for her removal from supervisory duties, it was the catalyst for a series of complaints which le[d] to a comprehensive review of her supervisory approach and her performance as Training Director. After the majority of trainees refused to be supervised by Dr. Hiatt, we had no option but to reevaluate her role. After several meetings with Dr. Hiatt and extensive conversations with the trainees, many concerning and disturbing behaviors about Dr. Hiatt's supervisory style were revealed. We determined that it was in the best interest of the trainees, the University, and the [HCC] to find a more suitable Training Director.

*Id.* at 528.

In an October 2013 email to Dr. Hiatt, DU set forth criteria for Dr. Hiatt to eventually resume supervision, including having "better awareness about the power she holds" and "demonstrating appropriate professional boundaries in all contexts." App. at 546.

On October 30, 2013, following an investigation, DU denied Dr. Hiatt's internal EEO complaint.

## 6. **Medical Leave and EEOC Charge**

From November 15, 2013, to February 2, 2014, Dr. Hiatt took a medical leave of absence because the work environment at DU was causing her problems such as panic attacks.

On December 23, 2013, while on medical leave from DU, Dr. Hiatt filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation.

7. **Return to Work**

In February 2014, Dr. Hiatt returned to work at DU. Upon her return, Dr. Palmateer increased Dr. Hiatt's weekly clinical hours from 22 to 24 hours. She also required Dr. Hiatt to provide a doctor's note to justify non-Family Medical Leave Act ("FMLA") sick leave, obtain permission before "blocking her schedule" (i.e., make certain blocks of time in her calendar unavailable for clinical appointments), and make up for missed clinical time. Dr. Hiatt asserts that no other HCC clinical staff member faced similar requirements.

Dr. Hiatt requested several "accommodations" on her return, including that she work no longer than eight-hour days and that DU provide dictation software to help her timely draft case notes. DU denied the request for dictation software, and it is not clear whether it approved the eight-hour request.

On April 23, 2014, Dr. Kent and Dr. Palmateer criticized Dr. Hiatt for absenteeism and late case notes. Dr. Kent also told Dr. Hiatt that if she wanted to keep her personnel matters private, as she had requested, she should not tell people that she was "suing the university" (presumably referring to her EEOC charge). App. at 204 ¶ 49. In April and May 2014, Dr. Kent drove by Dr. Hiatt's private practice. Dr. Kent maintains that he did so on his way to dog day care. Dr. Hiatt asserts that he was checking to see if she was there during times she was supposed to be at DU.

On May 30, 2014, Dr. Hiatt submitted a letter of resignation, in which she complained of retaliation for filing her internal EEO and EEOC complaints. She stopped working at DU four weeks later.

## B. *Procedural Background*

On January 28, 2015, Dr. Hiatt filed this lawsuit in the United States District Court for the District of Colorado. Her amended complaint, the operative one here, brought federal claims for sex discrimination under both Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972, and for retaliation for engaging in protected opposition to unlawful discrimination under both Title VII and Title IX. The amended complaint also alleged several state law claims, including for wrongful discharge in violation of public policy and intentional infliction of emotional distress.

On January 11, 2016, Defendants Colorado Seminary, Dr. Kent, and Dr. Palmateer filed a motion for summary judgment, which the district court granted on April 5, 2016. The court held Dr. Hiatt had failed to state a prima facie case for her sex discrimination claims under the *McDonnell Douglas* burden-shifting framework described below. The court reasoned that Dr. Hiatt had failed to show she was treated less favorably than similarly situated employees not in her protected class, which the court believed was "required" for Dr. Hiatt to state a prima facie case of sex discrimination. App. at 659-60.

On the retaliation claims, the court reasoned that, even if she could state a prima facie case, the claims failed because she did not show DU's reasons for any adverse employment actions were pretextual for retaliation.

- 11 -

Having rejected the federal claims, the court declined to exercise supplemental jurisdiction over the remaining state law claims. This appeal followed.

## II. DISCUSSION

Our review focuses on DU's reasons for the alleged adverse employment actions regarding Dr. Hiatt and whether those reasons were pretextual. As so limited, we have no reason to resolve whether Dr. Hiatt handled her personal relationship with Dr. Coven in accordance with her professional responsibilities. We consider only whether the reasons DU gave for Dr. Hiatt's demotion and maintaining her non-supervisory role were (1) legitimate, nondiscriminatory, and nonretaliatory, and (2) not pretextual.

We affirm all claims on appeal on the same basis: Dr. Hiatt is unable to show that DU's reasons for any alleged adverse employment actions were pretextual for discrimination or retaliation.[7]

### A. *Standard of Review*

"We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Twigg*, 659 F.3d at 997. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Twigg*, 659 F.3d at 997.

---

[7] We affirm on the retaliation claims on the same ground the district court relied on—lack of pretext. We affirm on the discrimination claims for lack of pretext—an alternative ground from the district court.

B. *Legal Standards*

1. **Title VII and Title IX**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from retaliating against employees who have opposed an unlawful employment practice such as sex discrimination. *Id.* § 2000e-3(a).

Title IX of the Education Amendments Act of 1972 provides similar protections. It prohibits discrimination "on the basis of sex" in educational programs or activities receiving federal funding. 20 U.S.C. § 1681(a). This includes a prohibition on employment discrimination in federally funded educational programs. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535-36 (1982). Title IX also prohibits retaliation against individuals because they have complained of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (interpreting Title IX as creating a private right of action for such a claim).

2. **Burden-Shifting Framework**

In district court, Dr. Hiatt relied on indirect evidence to oppose summary judgment on her discrimination and retaliation claims. This approach uses the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[8]

---

[8] The *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims. *See Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir.

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case

for discrimination or retaliation by showing an employer took adverse employment

action against the plaintiff based on the plaintiff's sex or protected activity. *Bird*,

832 F.3d at 1200 (sex discrimination claim); *Fye*, 516 F.3d at 1225 (retaliation

claim). The burden then shifts to the employer "to articulate a legitimate,

nondiscriminatory [or nonretaliatory] reason for the adverse action." *Bird*, 832 F.3d

at 1200. If the employer satisfies this burden, "then summary judgment is warranted

unless [the plaintiff] can show there is a genuine issue of material fact as to whether

the proffered reason[] [is] pretextual." *Id.* (quotations omitted).

We provide further background on two parts of the burden-shifting framework,

adverse employment actions and pretext.

### 3. **Adverse Employment Action**

For discrimination claims, "[a]n adverse employment action is a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in

benefits." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)

---

2016) (Title VII sex discrimination claim); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.").
 *McDonnell Douglas* applies to Title VII retaliation claims. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008). We also have applied the framework to Title IX retaliation claims, albeit not in a published case. *See, e.g.*, *Berry v. Mission Grp. Kan., Inc.*, 463 F. App'x 759, 766 n.7 (10th Cir. 2012) (unpublished). We apply the *McDonnell Douglas* framework here, as we have stated that Title VII is "the most appropriate analogue when defining Title IX's substantive standards." *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993).

(emphasis and quotations omitted). "[A] mere inconvenience or an alteration of job responsibilities" does not qualify as an adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotations omitted).

For retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). The action must be materially adverse "to separate significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners . . . ." *Id.*

### 4. **Pretext**

"[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory [and/or nonretaliatory] explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (brackets and quotations omitted). "Evidence that the employer should not have made the [adverse employment] decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it

honestly believed those reasons and acted in good faith upon those beliefs." *Id.*

(quotations omitted).

### C. *Analysis*

We assume without deciding that Dr. Hiatt could make a prima facie

*McDonnell Douglas* showing of sex discrimination and retaliation under Title VII

and Title IX. But her claims cannot survive summary judgment because she has

failed to show DU's proffered reasons for taking any adverse employment actions

were pretextual. Because all of Dr. Hiatt's federal claims require a showing of

pretext, and because she relies on the same evidence and arguments to show pretext,[9]

we resolve all of her claims on this ground.[10]

We first identify Dr. Hiatt's alleged adverse employment actions. We then

explain why Dr. Hiatt has not met her burden to show that DU's reasons for those

actions were pretextual.

---

[9] At oral argument, Dr. Hiatt's counsel stated that the "vast majority" of her pretext arguments were the same for both the discrimination and retaliation claims, but that "some" of them were different. Oral Arg. at 12:00-13:26. She failed, however, to identify then or in her briefing any pretext arguments that are different for any of her claims. *Id.*

[10] We have previously affirmed a grant of summary judgment on the basis of failure to show pretext after assuming without deciding that an employee has stated a prima facie case. *See, e.g.*, *Bird*, 832 F.3d at 1201 (analyzing pretext after "assum[ing] without deciding that [plaintiff-appellant] . . . has established a prima facie case showing that she was terminated because she is a woman."); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) ("Assuming [the plaintiff-appellant] has established a prima facie case . . . of gender stereotyping, the burden then shifts to [the defendant-appellee] to articulate a legitimate, nondiscriminatory reason for [the plaintiff's] termination.").

- 16 -

1. **Adverse Employment Actions**

In her opening brief on appeal, Dr. Hiatt identifies four adverse employment actions:  (1) her demotion from Training Director to Outreach Coordinator in February 2013; (2) DU's failure to reinstate her supervisory duties in August 2013; (3) her "constructive discharge" in May 2014; and (4) DU's differential treatment of her in the period leading up to her resignation in May 2014.[11]  At oral argument, Dr. Hiatt's counsel stated that the first three actions pertain to the discrimination claims, and the fourth is relevant to the retaliation claims.  But she did not make such a distinction in her opening brief.  Construing her arguments generously, we consider whether the following actions qualify as adverse employment actions for either the discrimination or retaliation claims.

a. *The Demotion and Failure to Reinstate Supervisory Duties*

A reasonable person in Dr. Hiatt's position would view her demotion to Outreach Coordinator, coupled with a salary decrease of $2,000, as an adverse employment action.  *See Burlington*, 548 U.S. at 71 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular

---

[11] At oral argument, Dr. Hiatt's counsel cited an exhibit to her opposition to summary judgment in district court, in which she listed several adverse employment actions relevant to her retaliation claims.  To the extent the list contains any actions not raised in her opening brief, we decline to consider them.  *See EEOC v. TriCore Reference Labs.*, 849 F.3d 929, 941 (10th Cir. 2017) (declining to consider arguments raised for the first time at oral argument not raised in an opening brief).

Also at oral argument, Dr. Hiatt's counsel argued that DU's failure to respond appropriately to the supervisees' reactions to her relationship was an adverse action.  Oral Arg. at 9:41-11:11.  But because Dr. Hiatt did not identify this issue as a separate adverse action in her opening brief on appeal, we do not address it.  *See TriCore Reference Labs.*, 849 F.3d at 941.

case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." (quotations omitted)). DU's later decision not to reinstate her supervisory duties was closely related to her demotion. We analyze it as a separate adverse action below.

b. *Constructive Discharge*

Dr. Hiatt was not constructively discharged, so there was no adverse employment action on this basis.

"[C]onstructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015) (quotations omitted). "To establish constructive discharge, a plaintiff must show that she had no other choice but to quit." *Id.* (quotations omitted).

The record shows Dr. Hiatt cannot meet those standards. Although she may have subjectively believed that DU left her with "no other choice but to quit," her "subjective views of the situation are irrelevant," and she must instead show "[t]he conditions of employment [were] objectively intolerable." *Id.* (quotations omitted). The working conditions she describes—such as being required to work two extra hours per week, turn in timely case notes, and justify non-FMLA sick time—do not amount to an objectively intolerable working environment. *See Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325-26 (10th Cir. 2004) (finding no constructive discharge when the plaintiff was humiliated due to an investigation into her management practices and reassigned to

- 18 -

another position whose conditions were not objectively intolerable); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533-34 (10th Cir. 1998) (finding no constructive discharge when the plaintiff was the "only teacher required to bring a doctor's note when she was sick," and was reprimanded for walking out of a meeting because the work environment, "while unpleasant," was not objectively intolerable).

We thus do not address Dr. Hiatt's alleged constructive discharge in our pretext analysis.

c. *Differential Treatment*

Dr. Hiatt asserts DU treated her differently from other HCC staff. Although she cites differential treatment as evidence of pretext in her opening brief, she changed her position at oral argument and claimed that differential treatment was a separate adverse action. Either way, Dr. Hiatt has not pointed to any similarly situated employees to show differential treatment.

A plaintiff can show differential treatment by providing evidence the employer treated the plaintiff differently from other similarly situated employees. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). An employee is similarly situated to the plaintiff if the employee shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history. *Id.*

Dr. Hiatt has failed to identify any other similarly situated employees who allegedly received differential treatment. She suggests Ross Artwohl and Kimberly Mercer as relevant comparators because, like she did, they reported to Dr. Palmateer. But

- 19 -

having a common supervisor, alone, is insufficient, and she mentions no other factors to support comparability. *See id.* at 1232.

Dr. Hiatt also proposes Dr. Fogle and Dr. Mathewson because Dr. Palmateer supervised them and the same professional standards applied to them as to Dr. Hiatt. But because Dr. Hiatt supervised these two individuals, they were not in positions comparable to Dr. Hiatt.

*        *        *        *

For the foregoing reasons, the only actions that qualify as adverse employment actions against Dr. Hiatt were (1) the demotion and (2) the failure to reinstate her supervisory duties.

2. **Legitimate Reasons and Pretext**

We now apply the second and third steps of the *McDonnell Douglas* framework and address (1) whether DU's reasons for the alleged adverse actions were legitimate, nondiscriminatory, and nonretaliatory; and, if so, (2) whether those reasons were pretextual. We conclude that DU's reasons were legitimate and that Dr. Hiatt has not met her burden to show the reasons were pretextual.

a. *The demotion*

i. <u>Legitimate, nondiscriminatory, and nonretaliatory reasons</u>

DU's reasons for demoting Dr. Hiatt fall into three categories: (1) the "upheaval among her students," including at least three out of five supervisees discontinuing supervision with her; (2) the "ethically grey" manner in how she handled her relationship with Dr. Coven relative to her professional responsibilities; and (3) her therapy-based

- 20 -

supervisory style and failure to take personal responsibility for the supervisees' reactions to how she handled her relationship relative to her work. *See* Aplee. Br. at 29-32.

DU's proffered reasons satisfy its burden to articulate legitimate, nondiscriminatory, and nonretaliatory reasons for the demotion. *See Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017). Dr. Hiatt does not challenge that determination.

We therefore next assess whether those reasons were pretextual for discrimination or retaliation. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) ("The parties do not dispute the first two steps in the *McDonnell Douglas* framework. Our analysis thus turns on the third step—pretext."); *see also Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1194 (10th Cir. 2016) (adopting the same approach).

### ii. Pretext

Dr. Hiatt has not satisfied her burden of showing DU's reasons for demoting her were pretextual for discrimination or retaliation. The record instead supports that DU "honestly believed" its proffered reasons and "acted in good faith upon those beliefs." *Swackhammer*, 493 F.3d at 1169-70 (quotations omitted). We begin with general considerations as to why DU's reasons were not pretextual and then analyze DU's specific reasons.

### 1) General considerations

Two general considerations—consistency and timing—support that DU's reasons were not pretextual.

a) Consistency

When Dr. Kent and Dr. Palmateer met with Dr. Hiatt on February 22, 2013, and presented the three options to her, the reasons they stated then are the same reasons that DU provides in this litigation. The consistency of their explanations cuts against a finding of pretext. *See Johnson*, 594 F.3d at 1211 (providing that inconsistent rationales may show pretext); *Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005) (providing that new rationales not given at the time of the adverse action may show pretext).

First, in the meeting, Dr. Kent and Dr. Palmateer explained to Dr. Hiatt that a "majority" of trainees refused to be supervised by her. App. at 450. This aligns with the rationale DU has presented in this case regarding the "upheaval" among the students, including at least three out of five supervisees' ending their supervision with Dr. Hiatt. Aplee. Br. at 29, 31-32.

Second, Dr. Hiatt was told in the meeting that her conduct posed a "grey ethical issue" and that a Training Director needed to "display exemplary ethics, boundaries, and professionalism." App. at 450. DU's second rationale in this litigation similarly posits that Dr. Hiatt lacked judgment in the way she handled her relationship with Dr. Coven relative to her professional responsibilities. DU also points to the steps leading to its determination that she had entered ethical grey territory. *See* Aplee. Br. at 29, 32.

Third, Dr. Kent and Dr. Palmateer explained during the meeting that Dr. Hiatt's "approach to therapy and supervision requires a strict adherence to boundaries which weren't demonstrated in this situation" and that her response to the students' upheaval showed a "lack of personal responsibility." App. at 450. In this case, DU has proffered a

parallel rationale that Dr. Hiatt lacked boundaries in supervision and failed to take personal responsibility for the students' reactions. Aplee. Br. at 30-33.

The consistency over time of DU's reasons for demoting Dr. Hiatt supports the conclusion that DU's reasons for demoting Dr. Hiatt were not pretextual.

### b) Timing

The timing of when DU first provided its reasons for Dr. Hiatt's demotion further undermines a finding of pretext for her retaliation claim. Dr. Kent and Dr. Palmateer initially gave Dr. Hiatt the reasons for her demotion in their February 22, 2013 meeting. But her first protected activity opposing discrimination—a necessary element for her retaliation claim—occurred on February 27, 2013, when her lawyer sent DU a letter making allegations of discrimination. This timing undercuts Dr. Hiatt's argument that DU's reasons for the demotion decision were pretextual. DU could not retaliate for Dr. Hiatt's protected activity until she had engaged in such activity. *See Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1225-26 (10th Cir. 2016) (providing that to show retaliation, a plaintiff must show an "adverse action by an employer either after or contemporaneous with the employee's protected action" and holding that the plaintiff could not show that element because the employer had made the adverse employment decision before learning about the plaintiff's protected activity); *Kenfield v. Colo. Dep't of Pub. Health & Env't*, 557 F. App'x 728, 733 (10th Cir. 2014) (unpublished) ("By its very nature, retaliatory conduct must come *after* the protected activity.").[12]

---

[12] Although unpublished and not precedential, we cite this decision for its persuasive value. *See* 10th Cir. R. 32.1(A).

2) Specific reasons

DU's specific reasons for the demotion also withstand Dr. Hiatt's arguments.

First, the record supports that DU honestly and in good faith believed the "upheaval among her supervisees" rendered Dr. Hiatt unable to continue as Training Director. Aplee. Br. at 29. Three of Dr. Hiatt's supervisees elected to end supervision with her—three out of nine according to Dr. Hiatt and three out of five according to DU. Regardless, three supervisees electing to discontinue supervision with Dr. Hiatt validated DU's concerns that she could not continue in a supervisory role.

Second, on appeal, Dr. Hiatt disputes DU's determination that her relationship with Dr. Coven placed her in an ethical grey area. But whether or not DU's "ethical greyness" assessment was valid, its investigation into the ethics of Dr. Hiatt's conduct shows its assessment was not a pretextual reason for her demotion.

Dr. Kent and Dr. Palmateer listened to Dr. Hiatt's and Dr. Fogle's accounts. Dr. Hiatt told them her supervisory relationship with Dr. Coven ended before a romantic one began. Dr. Fogle told them the romance started before the supervision ended. Dr. Kent presented both Dr. Hiatt's and Dr. Fogle's timelines of events to Dr. Philinda Hutchings—the Dean of the Midwestern School of Professional Psychology—and Dr. Bill Bracker—the former Director of the Nova Southeastern University Consortium Internship. Both Dr. Hutchings and Dr. Bracker concluded Dr. Hiatt's relationship was a "clear" ethical breach. App. at 447. In addition, Dr. Kent called the APA ethics office,

which advised that "given the alleged timing, [the relationship] could be seen as a gray area or it could be a violation." App. at 447-48.

Dr. Hiatt argues that DU improperly relied on Dr. Fogle's timeline, but an "[e]mployer may defeat the inference that an employment decision was a product of reliance on a biased subordinate by simply asking an employee for [her] version of events, and not relying exclusively on the say-so of the biased subordinate." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006) (brackets and quotations omitted). Consistent with *Smothers*, DU gave Dr. Hiatt multiple opportunities to explain her version of events.

In sum, DU's investigation into Dr. Hiatt's relationship as it related to her professional responsibilities was substantial and bore no marks of unfairness. Its determination that Dr. Hiatt had entered ethical grey territory as a result of that investigation—even if mistaken—does not suggest pretext. *See Piercy*, 480 F.3d at 1202 ("If the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, we cannot conclude they were a subterfuge for discrimination or, likewise, retaliation.").

Third, DU administrators believed the demotion decision was justified because Dr. Hiatt lacked boundaries in supervision and failed to take personal responsibility for her supervisees' reactions. Dr. Kent's meeting notes documented how Dr. Hiatt blamed her supervisees' pathologies for the upheaval. The revelation of Dr. Hiatt's relationship with Dr. Coven had the unexpected effect of shedding light on Dr.

- 25 -

Hiatt's approach to supervision. During Dr. Kent's discussion with Dr. Fogle after the "open meeting," Dr. Fogle described Dr. Hiatt's therapeutic supervisory style as sometimes causing Dr. Fogle to cry and feel vulnerable. Dr. Hiatt does not challenge Dr. Fogle's description of her therapy style. Indeed, Dr. Hiatt admitted in her deposition that supervisees even had a name for it—getting "Tawny-ed." App. at 166. Before Dr. Fogle's meeting with Dr. Kent, Dr. Shanley also had complained about Dr. Hiatt's approach, stating it made him feel "uncomfortable" and was "intrusive." App. at 178. This information reinforced DU's belief that Dr. Hiatt lacked proper boundaries when supervising.[13]

\* \* \* \*

Dr. Hiatt has not shown that DU's reasons for removing her from her position as Training Director and demoting her to Outreach Coordinator were dishonest or made in bad faith, *Shackhammer*, 493 F.3d at 1169-70, or were "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief," *Johnson*, 594 F.3d at 1211 (brackets and quotations omitted). She has thus not met her burden to show pretext to survive summary judgment on her discrimination or retaliation claims.

---

[13] Dr. Hiatt points to her supervisees' positive reviews of her supervision before they learned about her relationship with Dr. Coven as undermining any later criticism that she lacked boundaries in supervision. But those reviews were not anonymous. Dr. Hiatt has not presented facts that would discredit DU's belief.

b. *Failure to Reinstate*

Dr. Hiatt also challenged DU's decision not to reinstate her supervisory duties, arguing that Dr. Asher recommended she return to supervision.

i. Legitimate, nondiscriminatory, and nonretaliatory reasons

DU disputes that Dr. Asher had made such a recommendation, but even if she did, DU contends it could reasonably disagree with Dr. Asher's assessment and that her recommendation was just one factor in making its decision. According to DU, other factors included the supervisees' negative feedback about Dr. Hiatt, Dr. Kent's and Dr. Palmateer's observations of Dr. Hiatt's job performance, and their view that Dr. Hiatt continued to blame the interns for her demotion and failed to acknowledge her role in contributing to their reactions.

Once again, Dr. Hiatt does not contest these were legitimate, nondiscriminatory, and nonretaliatory reasons. We agree and turn to whether they were pretextual for discrimination or retaliation. *See Lobato*, 733 F.3d at 1289; *Foster*, 830 F.3d at 1194.

ii. Pretext

Dr. Hiatt has not met her burden to show that DU's reasons for not reinstating her supervisory duties were pretextual for discrimination or retaliation.

1) General Considerations

Like its demotion decision, DU consistently provided the same reasons for not returning Dr. Hiatt to a supervisory position in (1) the August 2013 meeting with Dr. Hiatt explaining the decision, (2) the September 2013 response to Dr. Hiatt's internal EEO complaint, and (3) this litigation. The consistency of DU's responses from the

time of the employment action to now supports that DU's reasons were not pretextual. *See Plotke*, 405 F.3d at 1102-03; *Johnson*, 594 F.3d at 1211.

2) Specific Reasons

Dr. Hiatt presents two main pretext arguments: (1) DU did not follow Dr. Asher's recommendation to reinstate her supervisory duties, and (2) DU imposed subjective standards to measure whether she could return to supervision. Neither shows pretext.

First, DU acted honestly and in good faith in not accepting Dr. Asher's recommendation. In Dr. Kent's view, Dr. Asher's recommendation was equivocal. Even assuming Dr. Asher firmly endorsed Dr. Hiatt's return to supervision, we agree with the district court that DU could reasonably disagree with her recommendation. And if DU exercised poor judgment, that is not enough to show pretext. *See Swackhammer*, 493 F.3d at 1169-70 (providing that an employer's mistake or use of poor business judgment is insufficient to show pretext).

DU had several legitimate reasons to disagree with Dr. Asher's recommendation. In their September 26, 2013 response to Dr. Hiatt's internal EEO complaint, Dr. Kent and Dr. Palmateer noted that Dr. Asher's recommendation came with the caveat that Dr. Hiatt was not likely to change her supervision style if she resumed her supervisory duties. In the six months after Dr. Hiatt was demoted, DU discovered additional cause for concern about her supervision style. In their exit interviews after she was demoted, several supervisees described "troubling

interactions" with Dr. Hiatt during supervision that gave DU further reason to believe Dr. Hiatt had "very poor boundaries." App. at 526-27.

Dr. Kent and Dr. Palmateer also noted in their response to Dr. Hiatt's internal EEO complaint that Dr. Hiatt had not demonstrated any awareness of how her supervisory style negatively affected the supervisees. Their response documented that, in her meetings with Dr. Asher, Dr. Hiatt continued to blame the supervisees' pathologies as causing the upheaval in the winter of 2013 rather than acknowledging her own contribution.

In sum, DU gave several reasons to disregard Dr. Asher's recommendation. Dr. Hiatt has not provided evidence to show that a reasonable factfinder could find those reasons unworthy of belief. *See Swackhammer*, 493 F.3d at 1169-70

Second, Dr. Hiatt tried to show pretext in district court by pointing to DU's use of "subjective criteria" to measure whether Dr. Hiatt could resume her supervisory duties. She pointed to the October 2013 email from Associate Provost for Student Life Patricia Helton, which called on Dr. Hiatt to have "better awareness about the power she holds" and "demonstrate[] appropriate professional boundaries in all contexts" before she could resume supervision. App. at 546.

Dr. Hiatt did not adequately explain in district court or here how the email instructions were subjective. But even if they were, the criteria do not signal pretext. Nothing in the email or elsewhere suggests DU implemented these criteria dishonestly or in bad faith. Instead, the criteria show DU was trying to create a path

for Dr. Hiatt to resume supervision. The email even expressed DU's hope that Dr. Hiatt eventually would return to supervision.

Dr. Hiatt has not shown DU's reasons for refusing to reinstate her supervisory duties were pretextual for retaliation or discrimination.

\* \* \* \*

Dr. Hiatt has not satisfied her burden of showing DU's reasons for demoting her or failing to reinstate her supervisory duties were pretextual for discrimination or retaliation. DU's proffered reasons were not so "incoherent, weak, inconsistent, or contradictory" as to be unworthy of belief by a reasonable factfinder. *See Johnson*, 594 F.3d at 1211. At most, Dr. Hiatt's evidence may support that DU may have made mistaken employment decisions. But arguments questioning the soundness of DU's decisions are insufficient to show DU acted dishonestly or in bad faith. *See Swackhammer*, 493 F.3d at 1169-70. Dr. Hiatt cannot, therefore, create a triable issue that DU's reasons for any adverse employment actions were pretextual for sex discrimination or retaliation.

## III. **CONCLUSION**

We affirm the district court's grant of summary judgment on Dr. Hiatt's Title VII and Title IX discrimination and retaliation claims.

- 30 -