FILED
**United States Court of Appeals
Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 18, 2022**

**Christopher M. Wolpert
Clerk of Court**

_____

JEANETTE RODRIGUEZ,

    Plaintiff - Appellant,

v.

ARAPAHOE COUNTY SHERIFF
TYLER S. BROWN, in his official
capacity,

    Defendant - Appellee.

No. 21-1124
(D.C. No. 1:18-CV-02919-KLM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

Plaintiff Jeanette Rodriguez, a deputy sheriff who works at the Arapahoe

County detention center, appeals the district court's decision granting her employer,

the Arapahoe County Sheriff, summary judgment on Rodriguez's employment

discrimination claims alleging disparate treatment and hostile work environment

based on her race (Hispanic), sex (female), and national origin (Venezuelan).  The

district court also granted the Sheriff summary judgment on Rodriguez's claims

alleging that the Sheriff retaliated against her when she complained about this

---

[*] This order and judgment is not binding precedent, except under the doctrines of law
of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

discriminatory mistreatment. Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM summary judgment for the Sheriff because Rodriguez failed to present sufficient evidence from which a reasonable jury could find that any of the mistreatment of which she complains was because on her race, sex, or national origin, or was taken in retaliation for her discrimination complaints.

## I. BACKGROUND

We have carefully considered the evidence in detail, viewing it in the light most favorable to Rodriguez. See Herrmann v. Salt Lake City Corp., 21 F.4th 666, 673 (10th Cir. 2021). Here, we recite that evidence only summarily. Rodriguez has worked as a deputy at the County detention center since 2008; there has never been any problem with her job performance. During annual training in 2015, however, Rodriguez drew the ire of a firearms instructor, Cunningham, during a training simulation in a "shoot house." Later that same day, while working with a different instructor, Rodriguez committed a safety violation at the shooting range, holstering her weapon while she was in a prone position. As a result of these two problems, Rodriguez was restricted from using her firearm until she passed additional training.[1]

Although Rodriguez contends that she performed well enough to pass the additional training, Instructor Stevie True and another instructor failed Rodriguez. This began a recurring cycle: Various trainers and supervisors would require

---

[1] Rodriguez was able to continue working despite this firearm restriction because deputies do not carry firearms in the detention center. But she could not perform all of her job duties. For example, Rodriguez was not able to transport detainees outside the jail because that would have required her to carry a firearm.

Rodriguez to undergo additional training, after which the trainers would fail her; her supervisors would then place Rodriguez on paid administrative leave and recommend that the Sheriff fire her; the Sheriff—David Walcher—would decline to fire Rodriguez, but would order her to undergo more training; and the cycle would begin again. This scenario played out at least three times over four years' time.

During this course of events, Rodriguez filed a complaint with the EEOC in January 2017, and amended that complaint in October 2017. When the EEOC issued Rodriguez a right-to-sue letter, she initiated this litigation in November 2018. After a new Sheriff—Tyler Brown—was elected, Rodriguez passed remedial training and her firearm restriction was lifted.

This litigation, however, continued. Rodriguez sued the Sheriff, in his official capacity,[2] asserting four claims: 1) a Title VII claim for disparate treatment discrimination and hostile work environment based on Rodriguez's race (Hispanic), sex (female), and national origin (Venezuela); 2) the same discrimination claims asserted under the Colorado Anti-Discrimination Act ("CADA"); 3) a Title VII retaliation claim; and 4) a retaliation claim under CADA. Following discovery, the district court[3] granted the Sheriff's motion for summary judgment on all of Rodriguez's claims. Rodriguez appeals that decision.

_____

[2] When Rodriguez initiated this litigation in 2018, David Walcher was the Sheriff. But because Rodriguez sued the Sheriff in his official capacity, Tyler Brown was substituted as the defendant after he took office.

[3] The parties consented to a magistrate judge deciding this case. See 28 U.S.C. § 636(c).

## II. STANDARD OF REVIEW

We review the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to Rodriguez and drawing all reasonable inferences in her favor.  See Herrmann, 21 F.4th at 673.  A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III. LEGAL DISCUSSION

Before addressing the merits of the district court's summary judgment decision, we note a couple of preliminary matters that affect the scope of our analysis.  Procedurally, Title VII required Rodriguez to exhaust her administrative remedies by filing a complaint with the EEOC within 300 days after each alleged discriminatory practice occurred.  See 42 U.S.C. § 2000e-5(e)(1); Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1310 & n.2 (10th Cir. 1999), overruled in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002).  In light of that, the district court ruled: Rodriguez could base her Title VII disparate treatment and retaliation claims on only discrete adverse employment actions occurring on and after March 9, 2016, which was 300 days before Rodriguez filed her first EEOC complaint in January 2017.  See Morgan, 536 U.S. at 105, 122.  But Rodriguez could rely on earlier incidents to support her Title VII hostile work environment harassment claim because she had identified at least one incident that was part of the alleged ongoing harassment that occurred after March 9, 2016.  See id.  Rodriguez does not challenge these rulings on appeal.

4

The district court's timeliness ruling, however, was limited to Rodriguez's Title VII claims. Her state-law CADA claims were subject to a different, six-month requirement for timely exhausting state administrative remedies. See Colo. Rev. Stat. § 24-34-403 (referencing § 24-34-306); see also Deneffe v. SkyWest, Inc., No. 14-cv-00348-MEH, 2015 WL 232128, at *4–5 (D. Colo. Jan. 16, 2015) (unreported) (applying state-law requirements for timely filing administrative complaint for CADA claims while applying federal time requirements for filing EEOC complaint for Title VII claims). In the district court, the Sheriff neither separately addressed and challenged the timeliness of Rodriguez's exhaustion of her CADA claims, nor did he cite any authority suggesting that the Title VII timeliness analysis should apply to the CADA claims. He does not address these CADA timeliness issues on appeal, either. Because the Sheriff asserts no statute of limitation defense as to the CADA claims, for purposes of this appeal we consider Rodriguez's CADA claims without any time limitations. See generally Deneffe, 2015 WL 232128, at *4–5 (treating statute of limitations for a CADA claim as an affirmative defense); San Juan Basin Consortium, Ltd. v. EnerVest San Juan Acquisition Ltd. P'ship, 67 F. Supp. 2d 1213, 1224, 1226 (D. Colo. 1999) (applying relevant Colorado statute of limitations in diversity action, noting defendant can waive affirmative statute-of-limitations defense); John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133 (2008) (noting that "the law typically treats a limitations defense as an affirmative defense . . . that is subject to forfeiture and waiver").

Substantively, the same legal standards apply to both Title VII and CADA claims. See Lamb v. Montrose Cnty. Sheriff's Off., No. 19-1275, 2022 WL 487105, at *3 (10th Cir. Feb. 17, 2022) (unpublished) (citing Johnson v. Weld Cnty., 594 F.3d 1202, 1219 n.11 (10th Cir. 2010)). Therefore, the following substantive analysis applies to both Rodriguez's Title VII and CADA claims. Because procedurally there is no time restriction on the incidents on which Rodriguez can base her CADA claims, we consider all of the alleged incidents she cites in the following substantive analysis with regard to the CADA claims. We turn first to Rodriguez's disparate treatment and hostile work environment claims before addressing her retaliation claims.

## A. Disparate treatment and hostile work environment claims[4]

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms,

---

[4] It is not at all clear that plaintiff is asserting a separate hostile work environment claim. She never separately addresses the elements of a hostile work environment claim apart from her disparate treatment discrimination claim. We give her the benefit of the doubt in this discussion because even if she did raise a separate hostile work environment claim, it would fail for the same reason her disparate treatment claim fails—she fails to allege and put on any evidence that the treatment and environment of which she complains was because of her race, sex, or national origins. She generally asserts "harassment" only in a conclusory fashion. The elements of a disparate treatment claim differ from the standard of hostile work environment claims, but we do not dwell on those difference here because both claims require that the complained of conduct be based on or related to her race, sex, and/or national origin. On appeal, Rodriguez did not address all the elements necessary to state a prima facie hostile work environment claim. However, that appears to be because in the district court the Sheriff only moved for summary judgment on the question of whether the "harassing conduct" was motivated by Rodriguez's race, sex, or national origin. (Aplt. App. 61.)

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such unlawful employment practices include harassment based on a protected trait that creates a hostile work environment. See Morgan, 536 U.S. at 115–16. CADA provides employees with the same protections. See Colo. Rev. Stat. § 24-34-402(1)(a). "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m).

As explained in greater detail below, the district court granted the Sheriff summary judgment on Rodriguez's disparate treatment and hostile work environment claims, ruling that Rodriguez failed to present sufficient evidence from which a reasonable jury could find that the conduct of which she complained was "because of" her race, sex, and/or national origin. We uphold that determination. See Throupe v. Univ. of Denver, 988 F.3d 1243, 1253 (10th Cir. 2021) (holding in that case that plaintiff's failure "to raise a triable fact about whether the defendants discriminated against him because of his sex . . . sinks both his hostile work environment and disparate treatment claims").

7

## 1. Disparate treatment claims

### a. This claim requires proof that the challenged conduct was based on a protected trait

Rodriguez sought to prove disparate treatment discrimination indirectly, using the burden-shifting McDonnell Douglas paradigm.[5]  Under that familiar analytical framework, an employee first must establish a prima facie claim for discrimination by showing that she 1) fell within a protected group, 2) was qualified for her position, and 3) suffered an adverse employment action under circumstances giving "rise to an inference of unlawful discrimination," Burdine, 450 U.S. at 253.  "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  Id. at 253–54.

> [T]he prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

Id. at 254 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

If an employee succeeds in establishing a prima facie claim, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the challenged employment actions.  Id. at 253.  The employer's burden is only one of production.

___

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252–56 (1981) (explaining the McDonnell Douglas analytical framework).

8

Id. at 254–56.  Here, the Sheriff satisfied his burden by asserting that he took the

challenged personnel actions because Rodriguez "demonstrated poor safety and

decision-making skills despite her ongoing training, and [she] could thus not perform

the duties of the deputy position."  (Aplt. App. at 1727.)  The Sheriff's proffered

explanation sufficiently rebutted any presumption of discrimination created by

Rodriguez's prima facie discrimination claim.  See Burdine, 450 U.S. at 254–55.

"The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Id. at 253.

> The plaintiff retains the burden of persuasion. She now must have the
> opportunity to demonstrate that the proffered reason was not the true
> reason for the employment decision. This burden now merges with the
> ultimate burden of persuading the court that she has been the victim of
> intentional discrimination. She may succeed in this either directly by
> persuading the court that a discriminatory reason more likely motivated
> the employer or indirectly by showing that the employer's proffered
> explanation is unworthy of credence.

Id. at 256 (citing McDonnell Douglas, 411 U.S. at 804–05).

In granting the Sheriff summary judgment, the district court ruled that

Rodriguez had failed to establish the third element of her prima facie claim because

she "has not demonstrated that the adversary employment actions occurred under

circumstances which give rise to an inference of unlawful discrimination," that is

discrimination because of a protected trait like her race, sex, and/or national origin.

(Aplt. App. 1744.)  The district court further ruled that, at the third step of the

McDonnell Douglas analysis, Rodriguez had also failed to rebut the Sheriff's

9

legitimate, nondiscriminatory reasons for the challenged actions he took against Rodriguez.

### b. Rodriguez incorrectly asserts that she did not need to produce evidence of the Sheriff's discriminatory motive or intent in support of her disparate treatment claim

Contrary to the preceding discussion, Rodriguez erroneously contends, for the first time on appeal, that she does not have to produce any evidence that the Sheriff acted with a discriminatory intent or motive in order to support her disparate treatment claim. Rodriguez's argument is not entirely clear.

If Rodriguez is asserting that she does not have to produce evidence of the Sheriff's discriminatory intent or motive because she is invoking McDonnell-Douglas's method of indirectly proving discrimination, Rodriguez forfeited that argument by not raising it in the district court. See Throupe, 988 F.3d at 1254. Moreover, that argument fails on its merits. The plaintiff's protected status "need only be a 'motivating factor' in the unlawful employment practice," but "[t]o maintain a claim under Title VII, the plaintiff must demonstrate that he was discriminated against because of a protected status, like sex," race, or national origin. Id. at 1251 (quoting 42 U.S.C. § 2000e-2(m)). As we have just explained, even under the McDonnell Douglas indirect-proof analytical framework, Rodriguez had to present sufficient evidence from which a jury could reasonably infer that the Sheriff took the challenged actions, at least in part, because of Rodriguez's protected trait(s).

If Rodriguez is, instead, arguing here that the district court erred by requiring her to prove more than that—that the district court instead required her to produce

10

direct evidence of the Sheriff's subjective discriminatory intent—that argument lacks merit. Our review of the district court's decision indicates that the court did not require Rodriguez to prove more than what the relevant McDonnell Douglas analysis mandates.

Rodriguez relies on two grounds to support her assertion that she does not have to produce any evidence that the Sheriff acted with a discriminatory intent or motive. First, she relies on two Supreme Court cases— Albemarle Paper Co. v. Moody, 422 U.S. 405, 422–23 (1975), and Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971)—that address disparate impact, rather than disparate treatment, discrimination claims. See Ricci v. DeStefano, 557 U.S. 557, 577–78 (2009). The Supreme Court has "long"

> distinguished between "disparate treatment" and "disparate impact" theories of employment discrimination.
>
> "'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics.] Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .
>
> "[C]laims that stress 'disparate impact' [by contrast] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive . . . is not required under a disparate-impact theory."

Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (emphasis added) (Age Discrimination in Employment Act case quoting Int'l Bhd. of Teamsters v. United

11

States, 431 U.S. 324, 335–336 n. 15 (1977) (construing Title VII)) (alterations added in Hazen Paper). Because Rodriguez alleged only disparate treatment claims, her reliance on disparate impact cases like Albemarle and Griggs is misplaced.

Second, Rodriguez relies on Bostock v. Clayton County, which held that when an employer fires an employee "for being homosexual or transgender," the employer violates Title VII's prohibition against discrimination based on sex. 140 S. Ct. 1731, 1737 (2020). The employers in Bostock conceded that the reason they fired the plaintiffs was because they were homosexual or transgender. Id. at 1744. So, unlike this case, there was no dispute in Bostock as to the employers' intent or motivation in acting against the employees. The question presented there, instead, was whether that conceded motivation based on plaintiffs being homosexual or transgender amounted to discrimination based on sex. Id. at 1737. The Supreme Court concluded that it did. Id. In reaching that conclusion, Bostock reiterated that Title VII "imposes liability on employers only when they 'fail or refuse to hire,' 'discharge,' 'or otherwise . . . discriminate against' someone because of a statutorily protected characteristic like sex"; discrimination means treating an "individual worse than others who are similarly situated"; and "[i]n so-called 'disparate treatment' cases like today's, . . . the difference in treatment based on sex must be intentional." Id. at 1740 (emphasis added). Consistent with Bostick's admonition and the language of Title VII itself, this court, post-Bostock, has continued to hold that in order "[t]o maintain a claim under Title VII, the plaintiff must demonstrate that he was discriminated against

because of a protected status, like sex," race, or national origin.  Throupe, 988 F.3d at

1251 (emphasis added).

In sum, then, Rodriguez is incorrect that she does not have to produce

evidence from which a reasonable jury could find that the Sheriff acted with a

discriminatory intent or motive because of a protected trait like her race, sex, and/or

national origin.  We conclude next that Rodriguez failed to present such evidence.

### c. Rodriguez failed to produce evidence from which a jury could find or reasonably infer that the Sheriff took the challenged employment actions against Rodriguez because of her protected trait(s)

We focus on the third step in the McDonnell Douglas analysis, where it was

Rodriguez's "ultimate burden" to persuade "the trier of fact that the defendant

intentionally discriminated against" her because of her race, sex, and/or national

origin.  Burdine, 450 U.S. at 253.  In response to the Sheriff's assertion of a

legitimate, non-discriminatory reason for the challenged employment actions,

Rodriguez had to produce evidence that the Sheriff's "proffered reason was not the

true reason for the employment decision[s]."  Id. at 256.  "She may succeed in this

either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence."  Id.[6]

---

[6] Although we focus our discussion on the third step of the McDonnell Douglas
analysis, the district court was also probably correct that, at step one, Rodriguez did
not state a prima facie disparate treatment claim because she failed to demonstrate
"that the adversary employment actions occurred under circumstances which give
rise to an inference of unlawful discrimination," that is discrimination because of a

Rodriguez adds one additional layer of analysis to her disparate treatment claim by relying at least in part on a "cat's paw" theory. "Under a cat's-paw theory of recovery (also known as 'subordinate bias' or 'rubber stamp' theory), an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action." Tudor v. Se. Okla. State Univ., 13 F.4th 1019, 1032 (10th Cir. 2021) (quoting Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir. 2015)). Here, Rodriguez asserted that it was Instructors Cunningham and True who were biased against Rodriguez because of her race, sex, and/or national origin and that their bias influenced the Sheriff's decisions to take adverse employment actions against

protected trait like her race, sex, and/or national origin. (Aplt. App. 1744.) We have still other concerns about Rodriguez's prima facie claim. Chief among those concerns is whether Rodriguez established that she suffered a sufficiently adverse employment action—that is, "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Throupe, 988 F.3d at 1252 (quoting Hiatt v. Colo. Seminary, 858 F.3d 1307, 1316 (10th Cir. 2017)). Here, the Sheriff did not fire or demote Rodriguez from her deputy position. Those in her chain of command placed Rodriguez on a performance improvement plan, or PIP, and several times placed her on paid administrative leave. But those actions usually are not sufficiently adverse to support a disparate treatment claim. See Paige v. Donovan, 511 F. App'x 729, 734–35 (10th Cir. 2013) (unpublished) (PIP); Juarez v. Utah, 263 F. App'x 726, 731, 737–38 (10th Cir. 2008) (unpublished) (paid administrative leave). Furthermore, although we need not decide the question definitively, we doubt that requiring Rodriguez to undergo remedial training was sufficiently adverse to support her disparate treatment claim. Cf. Couch v. Bd. of Trustees of Mem'l Hosp., 587 F.3d 1223, 1237–38, 1243 (10th Cir. 2009) (holding, in First Amendment case, that required training was not sufficiently adverse to support retaliation claim, applying more expansive definition of "adverse" than applies in Title VII disparate treatment claims).

14

Rodriguez.  "To survive summary judgment on a 'Cat's Paw' theory," Rodriguez had to

establish (1) "bias by the subordinates," (2) "their influence in the decision-making

process," and (3) the Sheriff's adoption of a "biased recommendation without an

independent investigation."  Ward v. Jewell, 772 F.3d 1199, 1205 (10th Cir. 2014) (citing

cases).[7]

With Rodriguez's theories in mind, we next explain why we agree with the

district court that Rodriguez failed to present sufficient evidence from which a

reasonable jury could find that the conduct of which she complained occurred

because of her race, sex, and/or national origin.  The evidence which the district court

---

[7] As explained next, Rodriguez failed to present sufficient evidence from which a reasonable jury could find that either Cunningham or True were biased against Rodriguez because of her race, sex, and/or national origin.  But, in addition, there are a number of other problems with Rodriguez's cat's paw theory.  For example, even if Cunningham was biased against Rodriguez because of her race, sex, and/or national origin, there was no evidence implicating him in any adverse action taken against Rodriguez except for the initial February 2015 report on her poor performance in the "shoot house."  While True was involved in a number of the remedial trainings that followed, so were a number of other instructors who also failed Rodriguez, yet Rodriguez does not allege that those other trainers acted with any discriminatory animus.  Additionally, before placing Rodriguez on paid leave and recommending that the Sheriff fire Rodriguez, members of her chain of command first met with Rodriguez to hear her side of the story.  Generally, under a cat's paw theory, the fact that a supervisor meets with the employee is sufficient to break any taint flowing from a biased subordinate.  See Hiatt, 858 F.3d at 1321; Ward, 772 F.3d at 1205.  Moreover, although members of Rodriguez's chain of command recommended that the Sheriff fire her, the Sheriff did not accept that recommendation, which preludes a reasonable jury from finding that the Sheriff just rubber-stamped and uncritically accepted his allegedly biased subordinates' recommendation.  See Tudor, 13 F.4th at 1032.  Furthermore, before requiring Rodriguez to undergo more training, the Sheriff first met with her and twice ordered an independent investigation into complaints she made that her instructors were discriminating against her.  In light of all of these problems, Rodriguez's cat's paw disparate treatment claim cannot survive summary judgment.  See id.; Hiatt, 858 F.3d at 1321; Ward, 772 F.3d at 1205.

15

rejected as insufficient included Rodriguez's belief that Instructors Cunningham and True were biased against her because of her race, sex, and/or national origin, her assertion that the Sheriff better treated deputies who were similarly situated to Rodriguez but who did not share her protected characteristics, and other miscellaneous evidence.

### i. There is insufficient evidence from which a reasonable jury could find that either Cunningham or True acted against Rodriguez because of her race, sex, and/or national origin

Rodriguez testified at her deposition that neither Cunningham nor True directed any racist or sexist comments toward her. Nevertheless, Rodriguez believed that they mistreated her because of her race, sex, and/or national origin. No matter how earnest her subjective and otherwise unsupported belief is, however, it alone is not sufficient for her claims to survive summary judgment. See, e.g., Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875–76 (10th Cir. 2004).

In further support of her belief, Rodriguez points to two earlier incidents involving Cunningham and True. Sometime between 2008 and 2011, at least four years before the events at issue here began, Cunningham, in conducting a shoot/don't shoot drill, used targets shaped like hands. Participants in the drill were not to shoot the white hands—the good guys—but were to shoot the brown hands—the bad guys. An Hispanic male deputy, Trujillo, asked Cunningham why the brown hands had to be the bad guys. According to Deputy Trujillo, Cunningham responded, "'Oh, I'll change it' or 'Don't worry about it,' or something to that effect." (Aplt. App. 1319.) There is no indication that Cunningham continued to use the white and brown targets

16

after Deputy Trujillo's question and no evidence of discriminatory motive or that Rodriguez was made aware of this matter.

In 2008—seven years before the events at issue here began—Instructor True, while booking into the detention center individuals charged with being in the United States illegally, "expressed joy over the deportation of undocumented aliens of Hispanic heritage by saying, 'Woo-hoo!  We got another one.'"  (Id. at 1734-35.) The district court aptly noted that this comment is ambiguous.  True could have simply been pleased at the deportation of undocumented aliens because they were immigrants without regard to whether they were Hispanic.

Each of these two incidents was ambiguous as to whether either Cunningham or True were intentionally acting with a bias against Hispanics.  Furthermore, these incidents were isolated and occurred years before the course of events involving Rodriguez.  In light of that, they provide no insight into Cunningham's or True's motivation for taking the challenged actions against Rodriguez.  These two incidents, then, are insufficient, alone or considered together, to support a reasonable jury finding that Cunningham and/or True acted were biased against Rodriguez because of her race, sex, and/or national origin.

### ii.  There is insufficient evidence that the Sheriff treated Rodriguez less favorably than he treated similarly situated deputies who do not share Rodriguez's protected traits

Moving beyond Cunningham's and True's alleged discriminatory motive, Rodriguez next asserts that the Sheriff's proffered non-discriminatory reason for requiring her to undergo additional training— because "she demonstrated poor safety

17

and decision-making skills despite her ongoing training" (id. at 1727)—was

unworthy of belief and was, instead, a pretext for discrimination based on

Rodriguez's race, sex, and/or national origin.  In support of that assertion, Rodriguez

contends that the Sheriff and his subordinates treated Rodriguez less favorably than

they treated similarly situated deputies who do not share Rodriguez's protected traits.

Rodriguez points to the following deputies as comparators:

> 1.  Deputy Brieske, a white male, accidentally shot himself while holstering his weapon during a training exercise, suffering minor injuries.  Deputy Brieske received a letter of reprimand and successfully completed remedial firearms training.  His use of a firearm was never restricted.
>
> 2. Deputy Hunt, a white woman, accidentally fired her weapon at a target during a training exercise, while unloading it.  Deputy Hunt was subjected to on-the-spot remediation.[8]
>
> 3. Deputy Hanson, a white male, while on duty at the detention center, inadequately patted-down a detainee, missing a knife that was then smuggled into the jail.  After Internal Affairs ("IA") investigated him, his supervisor suspended Hanson without pay for one or two days, he received a letter of reprimand, and his supervisor made a notation in his electronic TrakStar personnel record.
>
> 4. Deputy Carter, a black male, while on duty in the "Alternative Sentencing Program"—a program where detainees have greater freedom than they have in the detention center—left his firearm in an unsecured cubicle, which inmates

---

[8] Hunt shares Rodriguez's protected status as a woman.  It is Rodriguez's theory, however, that her protected traits should be considered together; that is, she contends that she was discriminated against and harassed because she is an Hispanic woman originally from Venezuela.  For summary judgment purposes, the district court accepted Rodriguez's contention.  We do the same.  The Tenth Circuit has recognized Title VII claims based on discrimination because of more than one protected trait.  See Frappied v. Affinity Gaming Black Hawk, LLC, 966 F.3d 1038, 1045 (10th Cir. 2020) ("Title VII also prohibits discrimination based on a combination of protected characteristics, such as 'sex-plus-race' discrimination, i.e., discrimination targeted only at employees of a particular race and sex.").

could access. Carter received a letter of reprimand and the violation was noted in his TrakStar record. A few days later, Carter left his "general access keys" unattended in an area inmates could access. This resulted in an IA investigation, and another letter of reprimand and TrakStar notation. Carter then resigned his position with the "Alternative Sentencing Program."[9]

Id. at 1729, 1732.

An employee can

"show pretext 'by providing evidence that he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness,'" provided the "similarly situated" employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable "relevant employment circumstances." Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005) (quoting Kendrick[ v. Penske Transp. Servs., Inc.], 220 F.3d [1220,] 1232 [(10th Cir. 2000]).

E.E.O.C. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 489 (10th Cir. 2006). Here, for summary judgment purposes, the district court accepted Rodriguez's assertion that these comparators were subject to the same performance standards as she was and that their safety violations were of comparable seriousness to one of Rodriguez's safety violations—the violation for holstering her weapon in the prone position on the firing range—because all of these violations fell under the same Sheriff's policy. Even so, the comparators were not similarly situated to Rodriguez.

---

[9] In addition to these four deputies, Rodriguez also points to Deputy Vigil, an Hispanic male who forgot to bring his weapon with him while transporting an inmate for medical treatment, yet suffered no adverse consequences. The Sheriff's Office, however, had no record of this safety violation and Rodriguez submits no evidence that this incident was ever brought to the attention of Vigil's supervisors. We, therefore, have no basis to compare the Sheriff's treatment of Vigil with his treatment of Rodriguez.

Comparators Brieske, Hunt, and Hanson committed only a single safety violation. Rodriguez, on the other hand, on the same day that she holstered while in the prone position at the firing range, also reportedly exhibited poor judgment during the training simulation in the "shoot house." Comparator Carter had more than one safety violation. But he self-corrected his problems by resigning from the Alternative Sentencing Program.

A further difference between Rodriguez and the proffered comparators was that Rodriguez continued to have trouble remediating the training officers' concerns about her judgment in using her firearm. While True was one of the instructors who noted these continuing problems, and Rodriguez asserts that True harbored a discriminatory animus against her, Rodriguez, as previously explained, failed to provide evidentiary support for that assertion. Moreover, it was not just True who noted Rodriguez's continuing problems exercising judgment as to how and when to use her firearm. A number of other instructors echoed those concerns, instructors that Rodriguez has not alleged harbored a discriminatory bias against her, including Johnston, Van Hook, Hallett, Gabriel, Dyffryn, and Hoffman. Rodriguez has not identified any proffered comparator who had similar continuing difficulties passing remedial training. The district court, therefore, properly rejected Rodriguez's comparison of her situation to the situation of these other four deputies.[10]

---

[10] Although the Sheriff has not raised the issue, another problem with the proffered comparators is that Rodriguez has not shown that they share the same supervisor as Rodriguez. "Generally, to be similarly situated, employees must 'deal with the same supervisor,' McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006), because

### iii.  Other evidence of discriminatory bias

Rodriguez asserts other evidence that she contends suggests that the Sheriff's asserted nondiscriminatory reasons for requiring her to undergo more training were a pretext for discrimination.  Rodriguez points, for example, to a 2013 settlement that then-Sheriff Robinson entered into with the U.S. Department of Justice because the Sheriff had "improperly restricted law enforcement positions to U.S. citizens notwithstanding the fact that no law, regulation, executive order, or government contract authorized it to restrict employment in this manner."  (Aplt. App. 1741 (quoting DOJ Press Release).)  Because this settlement and the policy it addressed pre-date Walcher becoming Sheriff, they are not relevant to whether Sheriff <u>Walcher</u> acted with any bias against Rodriguez.

Rodriguez next points to the TrakStar entry her supervisor, Lt. Wickstrom, made indicating that Rodriguez "successfully completed" the first remedial firearms training on February 13, 2015, contrary to Instructors True's and Van Hook's assertion that Rodriguez failed that training.  But the Sheriff presented undisputed

'[d]ifferent supervisors will inevitably react differently' to employee misconduct. <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000)." <u>Luke v. Hosp. Shared Servs., Inc.</u>, 513 F. App'x 763, 766 (10th Cir. 2013) (unpublished). Furthermore, the evidence in this case indicates that firearms instructors have discretion in how they deal with safety violations occurring at the shooting range.  Here, however, we do not know who the instructors were who addressed comparators Brieske's and Hunt's firearms safety violations.  Nor do we know what supervisors addressed comparator Hanson's and Carter's work-related safety violations.  Like Rodriguez, they all worked for the Sheriff.  But, while the Sheriff was actively involved in the challenged employment actions involving Rodriguez, it does not appear that he was involved in any of the proffered comparators' cases.

evidence that Lt. Wickstrom meant only to note that Rodriguez had successfully "qualified" with her firearm during the remedial training. Qualifying involves a deputy accurately firing a specified number of rounds at a target in a set time period. Qualifying does not mean that Rodriguez passed other firearm training addressing a deputy's judgment in how and when to use a firearm. Thus, Lt. Wickstrom stated that she only meant to indicate that Rodriguez had successfully "qualified," not that she had dispelled all of the concerns about her judgment in using her firearm. Moreover, Lt. Wickstrom had not attended the training and so had no first-hand knowledge of what transpired during the training.

Further, there were during the ensuing months and years a number of other instructors—instructors to whom Rodriguez does not attribute a discriminatory animus, including Van Hook, Hallett, Dyffryn, and Hoffman—who also expressed similar concerns with Rodriguez's judgment in using her firearm. Those instructors' reports corroborated, rather than contradicted, the Sheriff's belief that Rodriguez exhibited poor judgment in using her firearm. In light of that evidence, Lt. Wickstrom's TrakStar entry was insufficient to create a triable issue of fact as to whether the Sheriff's asserted non-discriminatory reason for requiring Rodriguez to undergo additional training was a pretext for discriminating against Rodriguez because of her race, sex, and/or national origin.[11]

---

[11] In her appellate brief, "Rodriguez adamantly denies" that she continued to commit safety violations throughout her ongoing training. (Aplt. Br. 31.) Even if the other instructors were mistaken about Rodriguez's continuing struggles in passing the remedial firearm training—she does not allege that these other instructors were

Lastly, Rodriguez asserts that the district court erred in failing to consider evidence from her co-workers indicating, among other things, that they had never seen any deputy treated in the manner in which she was treated, and that True lied about training Rodriguez when she attended the training academy in 2008. We find no error in the district court's treatment of this or any other evidence. We, thus, agree with the district court that Rodriguez failed to present sufficient evidence from which a reasonable jury could find that the adverse employment actions she challenges occurred because of her race, sex, and/or national origin.

---

biased against her because of her race, sex, and/or nation origin—thus, her assertion is insufficient to suggest that the Sheriff's proffered non-discriminatory reasons for requiring Rodriguez to undergo further training was a pretext for discrimination on the bases she alleges.

> "Evidence that the employer should not have made the [adverse employment] decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." . . . "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."

Hiatt, 858 F.3d at 1316 (quoting Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1169–70 (10th Cir. 2007)).

> In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision," Zamora v. Elite Logistics, Inc.], 478 F.3d [1160,] 1166 [(10th Cir. 2007) (en banc)] (quoting Watts v. City of Norman, 270 F.3d 1288, 1295 (10th Cir. 2001)); we do not look to the plaintiff's subjective evaluation of the situation, see McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998).

E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011).

23

### 2. Harassment/hostile work environment claims

Giving Rodriguez the benefit of the doubt, we assume that she also alleged harassment that made her work environment hostile.[12] To establish actionable harassment, Rodriguez had to show that 1) she is a member of a protected group, 2) she was subjected to unwelcome harassment, 3) the harassment was based on her protected trait(s), and 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment. See Payan v. United Parcel Serv., 905 F.3d 1162, 1170 (10th Cir. 2018) (emphasis added). Most relevant here, then, to survive summary judgment, Rodriguez had to "produce evidence from which a rational jury could infer that she was targeted for harassment because of her gender, race, or national origin." Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1327 (10th Cir. 2004); see also Payan, 905 F.3d at 1170.

The district court granted the Sheriff summary judgment on Rodriguez's harassment claims because "the evidence does not demonstrate that Cunningham's, True's, or any other decision-makers' actions constitute a race, gender, or national origin-based hostile work environment. Without such evidence, [Rodriguez] cannot

---

[12] In her complaint, Rodriguez alleged "harassment." Hostile work environment describes generally a subset of harassment claims actionable under Title VII. See Jones v. Needham, 856 F.3d 1284, 1289 (10th Cir. 2017) (distinguishing between "quid pro quo" sexual harassment and "hostile work environment" sexual harassment). The type of harassment claim asserted by Rodriguez is hostile work environment harassment.

24

show the purported hostile work environment was based on a protected trait."[13]

(Aplt. App. 1745.)  We agree with the district court.

"A hostile work environment claim is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'"  Throupe, 988 F.3d at 1251 (quoting Morgan, 536 U.S. at 117).  To prove a claim of harassment, Rodriguez could rely on acts that are overtly taken because of race, sex, or national origin, as well as acts that might seem neutral but when viewed in the context of other, overtly discriminatory conduct, are also part of the allegedly discriminatory work environment.  See id. (quoting Sanderson v. Wyo. Highway Patrol, 976 F.3d 1164, 1174 (10th Cir. 2020)); O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999).  Rodriguez could also rely on discriminatory acts taken against others in her workplace, so long as she shows that she was aware of those acts at the time she claims she was subject to a hostile environment based on her race, sex, or national origin and so long as such acts contributed to the hostile work environment she alleges.  See Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 959 (10th Cir. 2021); Tademy v. Union Pac. Corp., 614 F.3d 1132, 1146 (10th Cir. 2008).  This is true whether Rodriguez witnessed the discriminatory acts against others or heard about them second hand.  See Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 681 & n.5 (10th Cir. 2007).

---

[13] The district court did not address whether Rodriguez had established that the harassment of which she complained was sufficiently severe or pervasive "as it was not argued in" the Sheriff's summary judgment motion.  (Aplt. App. 1745 n. 7.)  As we have stated previously, we have doubt whether this record establishes that the alleged harassment was sufficiently severe or pervasive.  But we do not rely on that because this point was not raised in the district court or in this appeal.

To prove her harassment claims, Rodriguez relied on the same events on which she based her disparate treatment claims. In fact, she did not address her harassment claims separately from her disparate treatment claims. But as previously explained, Rodriguez did not assert any acts taken against her that were overtly <u>because of</u> her race, sex, or national origin. She acknowledged, for example, that neither Cunningham nor True, nor anyone else in her workplace, made derogatory comments based on her race, sex, or national origin. There was, then, no discriminatory context through which a reasonable jury could infer that any of the neutral acts taken against her were actually because of her race, sex, or national origin.

Deputy Trujillo testified at his deposition that he experienced discrimination at the Sheriff's Office because he was Hispanic, including his supervisor Aspinall refusing to call Trujillo by his name, but instead referring to Trujillo by other Hispanic surnames. The same supervisor physically assaulted Trujillo. But Rodriguez has not established that she was aware of these acts against Trujillo at the time she complained that her work environment was hostile to Hispanics.[14]

As previously explained, Cunningham's white hands/brown hands drill, which was discontinued, and True's glee at nabbing an immigrant not lawfully in the country occurred long before the events involving Rodriguez and were at most ambiguous. Nor

---

[14] Trujillo also testified about discrimination against him because of a perceived disability. There is no indication that Rodriguez was aware of these incidents but, in any event, they would not support her claims of a hostile work environment because of race, sex, or national origin.

has Rodriguez established that she was present for white hands/brown hands drill.  If not, she failed to address when she first heard about it.  She also does not explain how the Sheriff's Office's settlement with DOJ or any conduct it involved affected her work environment.  She otherwise makes vague assertions about other discriminatory comments or conduct, but fails to establish those incidents in any detail.  The district court, thus, correctly granted the Sheriff summary judgment on the hostile work environment claims.

### 3. Conclusion: Summary judgment for the Sheriff on Rodriguez's disparate treatment and  hostile work environment claims was proper

There is no evidence from which a reasonable jury could find that Rodriguez's alleged mistreatment was <u>because of</u> her race, sex, and national origin.  "Not all offensive or hurtful conduct within the workplace is actionable under Title VII," <u>Throupe</u>, 988 F.3d at 1255; only conduct undertaken because of an employee's protected trait(s).  The district court, therefore, properly granted the Sheriff summary judgment on Rodriguez's disparate treatment and  hostile work environment claims.

## B. Retaliation claims

We also uphold the district court's decision to grant the Sheriff summary judgment on Rodriguez's claims alleging that the Sheriff retaliated against her for complaining that she was being discriminated against.  In explaining why, we first state the relevant legal principles, briefly set forth Rodriguez's retaliation claims, and then discuss the fatal flaws the district court identified in these claims.

### 1. Relevant legal principles

Both Title VII and the CADA protect employees from an employer's retaliation for opposing discrimination.  See 42 U.S.C.A. § 2000e-3(a); Colo. Rev. Stat. § 24-34-402(1)(e)(IV).  Where, as here, Rodriguez did not present direct evidence of retaliation, she can prove her claim indirectly, using the McDonnell-Douglas burden-shifting framework.  See Parker Excavating, Inc. v. Lafarge W., Inc., 863 F.3d 1213, 1220 (10th Cir. 2017).  Under that framework, the employee must first establish a prima facie retaliation claim by

> plausibly alleg[ing] "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." See Khalik[ v. United Air Lines], 671 F.3d [1188,] 1193 [(10th Cir. 2012)].

Reznik v. inContact, Inc., 18 F.4th 1257, 1260 (10th Cir. 2021).[15]

If the employee succeeds in establishing a prima facie retaliation claim, the burden shifts to the employer to assert a legitimate non-retaliatory reason for the challenged adverse action.  See Edmonds-Radford v. Sw. Airlines Co., 17 F.4th 975, 994 (10th Cir. 2021) (applying McDonnell Douglas framework to retaliation claim under Americans with Disabilities Act).

---

[15]  In the retaliation context, a materially adverse employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  A broader range of materially adverse employment actions, then, can support a retaliation claim than can support a disparate treatment discrimination claim.  See id. at 56–57, 63–67.

28

Once the employer asserts a non-retaliatory reason for the challenged actions, the burden shifts back to the employee to show that the employer's asserted non-retaliatory reason was a pretext for unlawful retaliation. See id. The employee ultimately bears the burden of proving that "that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013).

### 2. Rodriguez's specific retaliation claims

Rodriguez alleged the following retaliatory actions, which we list chronologically:

1) Rodriguez complained about discrimination to Sergeant Walker, during the June 2015 IA investigation, and on August 19, 2015, Lieutenant Burson, who was overseeing the IA investigation, decommissioned Rodriguez, placed her on paid leave, and recommended that the Sheriff terminate her as a deputy.

2) Rodriguez alleged that, after she complained about discrimination to the Sheriff on August 26 and September 1, 2015, the Sheriff retaliated against her by placing her on a PIP in November 2015. But the evidence indicates that it was the training sergeant, Chase, who recommended placing Rodriguez on a PIP, and her chain-of-command agreed. There is no indication that it was the Sheriff who ordered Rodriguez placed on the PIP.[16]

3) In November 2015, Rodriguez complained about discrimination to her immediate supervisor, Sergeant Steffa, and soon thereafter, the PIP was extended.

---

[16] Perhaps because of this evidentiary problem, Rodriguez, for the first time on appeal, argues more generally that the Sheriff retaliated by requiring her to undergo more training. Because she did not assert this argument to the district court, however, she has forfeited it. See Singh v. Cordle, 936 F.3d 1022, 1043 (10th Cir. 2019). Nevertheless, even on the merits it cannot survive summary judgment, as explained below.

29

4) Rodriguez complained to the Sheriff about discrimination in June 2016. She did not specifically allege, however, any adverse employment action resulting from that complaint. (This may be part of Rodriguez's claim, raised for the first time on appeal, that the Sheriff retaliated against her by requiring more training.)

5) Rodriguez filed a complaint with the EEOC on January 3, 2017, alleging discrimination and retaliation, and the next day, January 4, Chief Line, accompanied by Lieutenant Knight, decommissioned her, placed her on paid administrative leave, and told her he was again recommending that the Sheriff terminate her as a deputy. But the evidence is undisputed that the EEOC complaint was not served on the Sheriff's Office until January 5. Rodriguez points to no evidence indicating that anyone in the Sheriff's Office knew about the EEOC complaint until Rodriguez told Chief Line about it on January 4. That was after Line informed her of these challenged adverse personnel actions. The undisputed evidence further indicates that she was returned to work within an hour of being placed on administrative leave on January 4, while the Sheriff investigated her discrimination claims.[17]

The record, then, does not support Rodriguez's second and fifth factual allegations of retaliation, and her fourth claim is inadequate. But those allegations, as well as the others, fail for other reasons too, as explained next.

**3. Rodriguez failed to show that the persons taking these adverse actions against her knew at the time that Rodriguez had complained about discrimination**

In order to establish the third element of her prima facie retaliation claims, Rodriguez had to show a causal connection between her protected activity opposing discrimination and the adverse employment actions of which she complains. See

---

[17] In the district court, Rodriguez also alleged that, a few months after the new sheriff, Brown, was elected, his undersheriff, Nicastle, retaliated against Rodriguez by requiring her to undergo still more training. And Rodriguez alleged a cat's paw argument based apparently on True holding a retaliatory animus against Rodriguez for complaining that True was discriminating. Rodriguez, however, does not reassert those claims on appeal. In any event, summary judgment for the Sheriff on those claims was appropriate.

Reznik, 18 F.4th at 1260.  In order to show a causal connection, Rodriguez had to show that at the time an actor took the challenged adverse action against her the actor knew about Rodriguez's protected opposition to discrimination.  See Singh, 936 F.3d at 1043.  Several of Rodriguez's retaliation claims lack this causal connection.  Specifically, Rodriguez failed to present evidence that either Chief Line or Lieutenant Knight knew that she had filed a complaint with the EEOC before they placed her on paid administrative leave in January 2017.

### 4.  Pretext

Even if Rodriguez was able to establish a prima facie claim as to the rest of her retaliation claims, the Sheriff proffered a non-retaliatory reason for requiring Rodriguez to undergo more training—"[T]he officers training [Rodriguez] consistently found that she demonstrated poor safety and decision-making skill despite her ongoing training" (Aplt. App. 1727).  Rodriguez contends, unpersuasively, that this reason was a pretext for retaliation.  On appeal, however, she addresses this argument in only a perfunctory manner, relying on some of the same evidence that she contends shows discrimination.

As a starting point, Rodriguez's chain of command, and the Sheriff in particular, consistently asserted, throughout this four-year course of events and the ensuing litigation, that they took the adverse actions against Rodriguez because they believed that she had demonstrated poor judgment and committed numerous safety violations during her remedial training sessions.  "The consistency of their explanations cuts against a finding of pretext."  Hiatt, 858 F.3d at 1319.

31

Rodriguez argues that it was incorrect that she continued to make safety errors and show poor judgment during her training. But she has failed to present any evidence that the Sheriff or the rest of her chain of command asserted these reasons to cover up their desire to retaliate against Rodriguez. Nor does she assert any evidence suggesting that the Sheriff or Rodriguez's subordinate chain of command, even if mistaken, did not honestly believe that Rodriguez had failed her remedial training. See id. at 1316; C.R. England, 644 F.3d at 1044.

In the district court, Rodriguez again relied on Lieutenant Wickstrom's notation in TrakStar that Rodriguez "successfully completed" the first remedial training in February 2015. That, again, is insufficient to create a disputed question of fact as to whether the Sheriff honestly believed that Rodriguez had shown poor judgment throughout the remedial training, warranting more training. The two trainers who conducted the February 2015 remedial training, as well as numerous trainers after that—trainers to whom Rodriguez does not attribute any retaliatory motive, including Van Hook, Hallett, Dyffryn, and Hoffman—corroborated Rodriguez's poor judgment and safety record in using her firearm. Those reports bolster, not contradict, the non-retaliatory reasons the Sheriff and Rodriguez's chain of command asserted to justify the adverse actions they took against her.

### 5. Temporal proximity

Finally, Rodriguez contends that the close temporal proximity between her discrimination complaints and the allegedly retaliatory adverse actions she incurred is sufficient alone for her retaliation claims to survive summary judgment. Even if

32

Rodriguez could rely on close temporal proximity here to establish a prima facie retaliation claim, see Bekkem v. Wilkie, 915 F.3d 1258, 1271 (10th Cir. 2019), it is insufficient for her to meet her ultimate burden of proving that a retaliatory motive was the "but for" cause of those adverse actions, see Bird v. W. Valley City, 832 F.3d 1188, 1204 (10th Cir. 2016) (citing cases). The district court, then, did not err in granting the Sheriff summary judgment on Rodriguez's retaliation claims.

## IV. CONCLUSION

The district court properly granted the Sheriff summary judgment on all of Rodriguez's claims. Fatal to her disparate treatment and hostile work environment claims, Rodriguez failed to present sufficient evidence from which a reasonable jury could find that the challenged adverse actions taken against her were either because of her race, sex, and/or national origin or taken in retaliation for her claims of discrimination. Nor could a reasonable jury find that her work environment was hostile because of harassment based on race, sex, or national origin. We, therefore, AFFIRM the district court's summary judgment decision.

Entered for the Court

David M. Ebel
Circuit Judge